WRIGHT et al. *v.* ROCKEFELLER, GOVERNOR OF
NEW YORK, et al.

No. 96.   Argued November 19, 1963.—Decided February 17, 1964.

*Justin N. Feldman* argued the cause for appellants.
With him on the briefs were *Jerome T. Orans* and *Elsie
M. Quinlan.*

*Irving Galt,* Assistant Solicitor General of New York,
and *Jawn A. Sandifer* argued the cause for appellees.
With *Mr. Galt* on the brief for appellees Rockefeller et al.

were *Louis J. Lefkowitz,* Attorney General of New York, *Sheldon Raab,* Assistant Attorney General, and *Barry Mahoney,* Deputy Assistant Attorney General. *Mr. Sandifer* also filed a brief for appellees Powell et al.

Mr. Justice Black delivered the opinion of the Court.

Appellants, citizens and registered voters of New York's Seventeenth, Eighteenth, Nineteenth, and Twentieth Congressional Districts, all in New York County (the Island of Manhattan), brought this action in the United States District Court for the Southern District of New York challenging the constitutionality of that part of Chapter 980 of New York's 1961 congressional apportionment statute which defined these four districts.[1] The Governor and several other New York state officials were named as defendants. Congressman Adam Clayton Powell, who represents the Eighteenth Congressional District, and several other New York County political leaders were permitted to intervene as defendants supporting the constitutionality of the apportionment act. Appellants charged that the part of the New York Act in question deprived them of rights guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment and by the Fifteenth Amendment, which provides that "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." Their complaint alleged that:

> "Chapter 980 establishes irrational, discriminatory and unequal Congressional Districts in the County of New York and segregates eligible voters by race and place of origin. It is contrived to create one district, the 17th Congressional District, which excludes

[1] N. Y. State Law, § 111.

non-white citizens and citizens of Puerto Rican origin and which is over-represented in comparison to the other three districts in the County of New York. The 18th, 19th and 20th Congressional Districts have been drawn so as to include the overwhelming number of non-white citizens and citizens of Puerto Rican origin in the County of New York and to be under-represented in relation to the 17th Congressional District." [2]

The case was heard by a District Court of three judges. During these hearings, counsel for appellants made it clear that their case did not depend on "under-representation because of the variation in the size of the Congressional districts"; it was rather, he said, "a case of ghettoizing the Island of Manhattan" so as "to create a white Congressional district and a non-white Congressional district." "I think," counsel said, "the only province of the Court in this area is to determine whether or not these districts have been created with racial considerations in mind, and, if they have, or if the results of this districting, the effect of the statute is to create racially segregated areas, we maintain that it violates the Fourteenth and Fifteenth Amendments." Appellants offered maps, statistics, and some oral evidence designed to prove their charge that it was impossible to have districts such as these were unless they "were drawn with regard to race." The statistics showed that the Eighteenth District contained 86.3% Negroes and Puerto Ricans; the Nineteenth, 28.5%; the Twentieth, 27.5%; and the Seventeenth, 5.1%. The evidence also showed irregularities in the boundaries of the districts and some varia-

---

[2] The complaint also stated that unconstitutional districting had existed for many years but that repeated efforts to bring about legislative correction had been of no avail, partly because of unconstitutional apportionment of the state legislature. Appellants did not offer proof to support these allegations, however.

tion in population among the four.[3] Appellees presented no oral testimony but did offer historical maps, a table from the Bureau of the Census, and a message from the President to the Congress on the subject of congressional apportionment.

A majority of the District Court found that appellants had not made out their case on the crucial factual issues.[4] Judge Moore broadly found that "[n]o proof was offered by any party that the specific boundaries created by Chapter 980 were drawn on racial lines or that the Legislature was motivated by considerations of race, creed or country of origin in creating the districts."[5] He concluded, "Plaintiffs having failed upon the facts and the law to establish any violation of their constitutional rights as a result of the action of the New York Legislature in enacting Chapter 980 of the Laws of 1961, the complaint must be dismissed."[6] Judge Feinberg concurred in Judge Moore's result because he, too, believed that appellants had

> "not met their burden of proving that the boundaries of the new 17th, 18th, 19th, and 20th Congressional Districts were drawn along racial lines, as they allege. . . .
>
> .    .    .    .    .
>
> ". . . Plaintiffs did introduce evidence which might justify an inference that racial considerations motivated the 1961 reapportionment of congressional districts in Manhattan.  However, other inferences, as set forth below, are equally or more justifiable. Plaintiffs have a difficult burden to meet in attack-

---

[3] The population of the Seventeenth Congressional District was 382,320; the Eighteenth, 431,330; the Nineteenth, 445,175; and the Twentieth, 439,456.

[4] 211 F. Supp. 460.

[5] *Id.*, at 462.

[6] *Id.*, at 468.

ing the constitutionality of this state statute. . . . Upon analysis, I do not think that burden has been met.

. . . . .

". . . In short, based upon the entire record, I do not feel that plaintiffs have proved their case." [7]

Judge Murphy dissented. He viewed the evidence as "tantamount for all practical purposes, to a mathematical demonstration" that the legislation was "solely concerned with segregating" white voters from colored and Puerto Rican voters "by fencing colored and Puerto Rican citizens out of the 17th District and into a district of their own (the 18th)" and as establishing *"per se a prima facie* case of a legislative intent to draw congressional district lines in the 17th and 18th Districts on the basis of race and national origin." [8]

While a number of other matters have been discussed, we find it necessary to decide only the first question presented in the jurisdictional statement, namely "[w]hether appellants sustained their burden of proving that the portion of Chapter 980 . . . which delineates the boundaries of the Congressional districts in Manhattan Island segregates eligible voters by race and place of origin in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment and in violation of the Fifteenth Amendment." We accept the findings of the majority of the District Court that appellants failed to prove that the New York Legislature was either motivated by racial considerations or in fact drew the districts on racial lines. Compare *Gomillion* v. *Lightfoot,* 364 U. S. 339. It may be true, as Judge Feinberg thought, that there was evidence which could have supported inferences that racial considerations might have moved the

---

[7] *Id.,* at 468, 469, 471.

[8] *Id.,* at 472–473.

state legislature, but, even if so, we agree that there also was evidence to support his finding that the contrary inference was "equally, or more, persuasive." [9] Where there are such conflicting inferences one group of them cannot, because labeled as "prima facie proof," be treated as conclusive on the fact finder so as to deprive him of his responsibility to choose among disputed inferences. And this is true whether the conflicting inferences are drawn from evidence offered by the plaintiff or by the defendant or by both. *Hernandez* v. *Texas*, 347 U. S. 475, does not support the dissenting view of Judge Murphy that appellants' evidence here established a prima facie case compelling the District Court, despite conflicting inferences which could be drawn from that evidence, to find that New York created these districts on the basis of race and place of origin. *Hernandez* followed the rule laid down in *Norris* v. *Alabama,* 294 U. S. 587, and other cases,[10] that proof of a long-continued state practice of not calling Negroes as jurors made out a prima facie case sufficient to justify, but not necessarily to compel, a finding of discrimination on account of race. The conclusion of racial discrimination in those cases was reached only after an appraisal of this practice along with all the circumstances. It is plain to us that the District Court was not compelled to find that these districts were the product of a state contrivance to discriminate against colored or Puerto Rican voters. As the majority below pointed out, the concentration of colored and Puerto Rican voters in one area in the county made it difficult, even assuming it to be permissible, to fix districts so as to have anything like an equal division of these voters among the districts.[11] Undoubtedly some of these voters, as shown by this lawsuit,

[9] *Id.,* at 471.

[10] *E. g., Pierre* v. *Louisiana,* 306 U. S. 354, 361–362; *Smith* v. *Texas,* 311 U. S. 128, 130–131; *Hill* v. *Texas,* 316 U. S. 400, 404.

[11] 211 F. Supp., at 467–468 (Moore, J.), 471 (Feinberg, J.).

would prefer a more even distribution of minority groups among the four congressional districts, but others, like the intervenors in this case, would argue strenuously that the kind of districts for which appellants contended would be undesirable and, because based on race or place of origin, would themselves be unconstitutional.

We accept the District Court's finding that appellants have not shown that the challenged part of the New York Act was the product of a state contrivance to segregate on the basis of race or place of origin. That finding was crucial to appellants' case as they presented it, and for that reason their challenge cannot be sustained. We do not pass on the question which appellants have not presented here, that is, whether the state apportionment is constitutionally invalid because it may fail in its objective to create districts based as nearly as practicable on equal population.[12]  See *Wesberry* v. *Sanders, ante*, p. 1. Since no such challenge has been urged here, the issues have not been formulated to bring it into focus, and the evidence has not been offered or appraised to decide it, our holding has no bearing on that wholly separate question.

The judgment dismissing the complaint is

*Affirmed.*

MR. JUSTICE HARLAN, concurring.

I join the opinion of the Court on the premise that the only issue in this case involves alleged racially segregated districts. The case is thus, in my opinion, governed by entirely different constitutional considerations, see *Gomillion* v. *Lightfoot,* 364 U. S. 339, than those which I believe

---

[12] The Committee of the New York Legislature which proposed the 1961 apportionment bill said in its report, "It is the conclusion of your Committee that the most important standard is substantial equality of population." McKinney's N. Y. Laws, 1961 (Second Extraordinary Session), 63, 64.

should govern in *Wesberry* v. *Sanders, ante,* p. 1, also decided today, in which I have filed a dissenting opinion, *ante,* p. 20.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE GOLD-BERG concurs, dissenting.

This case raises a question kin to that in *Gomillion* v. *Lightfoot,* 364 U. S. 339, where racial gerrymandering was used to deprive Negroes of the right to vote. Here no Negroes are deprived of the franchise. Rather, zigzag, tortuous lines are drawn to concentrate Negroes and Puerto Ricans in Manhattan's Eighteenth Congressional District and practically to exclude them from the Seventeenth Congressional District. Neighborhoods in our larger cities often contain members of only one race; and those who draw the lines of Congressional Districts cannot be expected to disregard neighborhoods in an effort to make each district a multiracial one.[1] But where, as here, the line that is drawn can be explained only in racial terms, a different problem is presented.

## I.

Manhattan is divided into four districts and as a result of the serpentine path that the lines follow, those districts reflect substantial, though not complete, segregation by races:

| District | White percent of district | Negro and Puerto Rican percent of district |
|---|---|---|
| 17th | 94.9 | 5.1 |
| 18th | 13.7 | 86.3 |
| 19th | 71.5 | 28.5 |
| 20th | 72.5 | 27.5 |

[1] Nor does the Constitution require a scheme for exact equality in districting, let alone a "mathematically-based procedure for districting which produces contiguous districts nearly equal in population." See Weaver and Hess, A Procedure for Nonpartisan Districting: Development of Computer Techniques, 73 Yale L. J. 288, 307 (1963).

In 1961 the legislature expanded the Seventeenth District by altering its boundaries in three respects: (1) it added an area on the upper East Side between 59th Street and 89th Street *of whose population Negroes and Puerto Ricans make up 2.7% of the total;* [2] (2) it added an area on the lower East Side called Stuyvesant Town *of whose population Negroes and Puerto Ricans make up 0.5% of the total;* and (3) it dropped from the Seventeenth District and added to the Eighteenth District a two-block area from 98th Street to 100th Street between Fifth Avenue and Madison Avenue *of whose population Negroes and Puerto Ricans make up 44.5% of the total.*

To achieve this racial gerrymandering, careful manipulation of the boundaries of the Eighteenth District was necessary. The southeast corner is near the East River and from there it goes—west four blocks, north two blocks, west one block, north five blocks, west one block, north one block, west one block, north one block, west one block, north eleven blocks, west five blocks across the northern line of Central Park to Morningside, north along Morningside about twelve blocks, west one block, north along Amsterdam from 122d to 150th, east two blocks, north fifteen blocks to 165th, and east to East River.

The record strongly suggests that these twists and turns producing an 11-sided, step-shaped boundary between the Seventeenth and Eighteenth Districts were made to bring into the Eighteenth District and keep out of the

---

[2] An area extending from 89th Street to 95th Street, between Third Avenue and the East River, was left in the Eighteenth District. This area of 10,507 persons is less than 5% Negro and Puerto Rican. There is, however, a new low-cost public housing project (of the type in which the average Negro-Puerto Rican occupancy in Manhattan will be about 75%) which has been scheduled for construction in that area. Because of that project and the general southward push of the Negro and Puerto Rican population, the area south of 95th Street appears to be but a temporary buffer zone.

Seventeenth as many Negroes and Puerto Ricans as possible. There is to be sure no finding to this effect by the three-judge District Court. One of the three judges thought, as I do, that the uncontradicted facts establish *per se* a prima facie case of a legislative purpose to design the Seventeenth and Eighteenth Districts on racial lines (211 F. Supp. 460, 472–473), saying that: "[In *Gomillion*] . . . it was a glaring exclusion of Negroes from a municipal district. Here it is a subtle exclusion from a 'silk stocking district' (as the 17th is so frequently referred to) and a jamming in of colored and Puerto Ricans into the 18th or the kind of segregation that appeals to the intervenors." *Id.*, at 474–475.

A second judge concluded that petitioners "have not met their burden of proving" that the boundaries in question were "drawn along racial lines." *Id.*, at 468. The third judge expressed no view on the precise issue.[3]

The evidence which I have summarized was not rebutted or challenged, the State introducing no evidence. We have not only inferences from conceded facts but also New York's frank concession that it is not possible to say "that race is irrelevant to districting."

Racial segregation that is state-sponsored should be nullified whatever may have been intended. In *Johnson v. Virginia,* 373 U. S. 61, we held segregation of a courtroom audience by race to be unconstitutional, without stopping to inquire what the motive may have been. A

---

[3] The closest intimation, though not on the precise issue, is contained in the following statement which he made in his opinion:

"No proof was tendered that the Legislature in drawing the district lines in previous years was motivated or influenced by any considerations which have become unconstitutional during subsequent years. Plaintiffs wholly failed to support their allegation of 'repeated and energetic efforts' to seek legislative correction or that efforts were unavailing because of unconstitutional apportionment." 211 F. Supp., at 467.

well-settled proposition applicable to many rights in the constitutional spectrum is that there may be an abridgement "even though unintended." See *NAACP* v. *Alabama,* 357 U. S. 449, 461, and cases cited. What the State has done is often conclusive irrespective of motive. *Eubanks* v. *Louisiana,* 356 U. S. 584, 587–588.

I had assumed that since *Brown* v. *Board of Education,* 347 U. S. 483, no State may segregate people by race *in the public areas.* The design of voting districts involves one important *public area*—as important as schools, parks, and courtrooms. We should uproot all vestiges of *Plessy* v. *Ferguson,* 163 U. S. 537, from *the public area.*

The intervenors are persons who apparently have a vested interest in control of the segregated Eighteenth District.[4] They and the State seem to support this segregation not on the "separate but equal" theory of *Plessy* v. *Ferguson, supra,* but on another theory. Their theory might be called the theory of "separate but better off"—a theory that has been used before. A like argument was made in *Buchanan* v. *Warley,* 245 U. S. 60, 81, in support of municipal segregation of residential areas; in *District of Columbia* v. *Thompson,* 346 U. S. 100, in support of segregation in restaurants; in *Watson* v. *Memphis,* 373 U. S. 526, in support of delayed integration of. municipal parks. Indeed, the final argument of John W. Davis for South Carolina in *Brown* v. *Board of Education, supra,* ended with the words, "The good is sometimes better than the best."

The fact that Negro political leaders find advantage in this nearly solid Negro and Puerto Rican district is irrelevant to our problem. Rotten boroughs were long a curse of democratic processes. Racial boroughs are also at war with democratic standards.

---

[4] Adam Clayton Powell has represented the Eighteenth District in Congress since 1945.

## II.

What we have in the Seventeenth and Eighteenth Districts in Manhattan is comparable to the Electoral Register System which Britain introduced into India. That system gave a separate constituency to Sikhs, Muslims, Anglo-Indians, Europeans, and Indian Christians.[5] Religious minorities found comfort and safety in such an arrangement. A Muslim deputation made the following demand: [6]

"(1) That in the whole of India the Muslims number over 62 millions or between one-fifth and one-fourth of the total population;

"(2) that as their numbers exceed the entire population of any first-class European Power, except Russia, Muslims might justly claim adequate recognition as an important factor in the State;

"(3) that the representation hitherto accorded to them, almost entirely by nomination, had been inadequate to their requirements and had not always carried with it the approval of those whom the nominees were selected to represent; and

"(4) that while Muslims are a distinct community with additional interests of their own, which are not shared by other communities, no Muslim would ever be returned by the existing electoral bodies, unless he worked in sympathy with the Hindu majority in all matters of importance."

---

[5] Acharya, Indian Elections and Franchise (1937), p. 17:
"No one who is not a Sikh, a Muhammadan, Anglo Indian, European or an Indian Christian, is entitled to be included in a Sikh, Muhammadan, Anglo Indian, European or an Indian Christian constituency respectively. No person who is entitled to be included in a Sikh, Muhammadan, Anglo Indian, European or an Indian Christian constituency will be included in the electoral roll for a General Constituency in a province."

[6] Ahsan, Community Electorates in India (1934), pp. 6–7.

Lord Morley made the following reply: [7]

"The Muslims demand three things. I had the pleasure of receiving a deputation from them and I know very well what is in their minds. They demand an election of their own representatives to these councils in all the stages just as in Cyprus, where, I think, Muslims vote by themselves; they have nine votes and the non-Muslims have three or the other way about; so in Bohemia where the Germans vote alone and have their own register; therefore we are not without a precedent and a parallel for the idea of a separate register. Secondly, they want a number of seats in excess of their numerical strength. These two demands we are quite ready and intend to meet in full."

Hindus responded favorably.[8] The Joint Report of 1918 stated: [9]

"Some persons hold that for a people, such as they deem those of India to be, so divided by race, religion and caste as to be unable to consider the interests of any but their own section, a system of communal electorates and class representation is not merely inevitable but is actually best. They maintain that it evokes and applies the principle of democracy over the widest range over which it is actually alive at all, by appealing to the instincts which are strongest; and that we must hope to develop the finer, which are also at present the weaker instincts by using the forces that really count. According to this theory communal representation is an inevitable and even a healthy stage in the development of a non-political people."

[7] *Id.*, at 11.
[8] *Id.*, at 12.
[9] *Id.*, at 16.

As already noted, the Electoral Register System was not peculiar to British India. Other nations used it.[10]  Lebanon today has a modified version: each of eight religious

---

[10] The constitution of modern Cyprus divides the electorate into the Greek community, the Turkish community, and religious communities.  Constitution of Cyprus, Aug. 16, 1960, Pt. I, Art. 2 (3).  The legislature is allotted 70% to the Greek community and 30% to the Turkish.  *Id.,* Pt. IV, Art. 62 (2).  Each community elects a communal chamber that has legislative power over select matters, *e. g.,* religion, education, personal status, etc.  *Id.,* Pt. V, Arts. 86, 87.

Allocation along community lines of specified offices appears in various forms at each stratum of government.  For example the President is Greek, the Vice President, Turkish.  *Id.,* Pt. I, Art. 1.  "The public service shall be composed as to seventy per centum of Greeks and as to thirty per centum of Turks."  *Id.,* Pt. VII, Art. 123 (1).

Cyprus shows some of the end products of fractionalizing communities by race.  After the recent riots of Turks versus Greeks, Arnold Toynbee commented on the Cyprus complex:

"Unfortunately the Cypriots have to contend with the incubus of their history, and of the memories that this history has left rankling in their minds.

"Cyprus, together with the Lebanon, is the last unpartitioned remnant of a great multi-national society, the Ottoman Empire.  In the course of the last 150 years, all the rest of the vast former Ottoman dominions has been partitioned into a mosaic of national successor-states, in each of which some single nationality is now master of the house.

"Unfortunately the tide of history has run too strongly in the direction of partition on national lines, with all the woes that this inevitably entails.  The mutual animosity of the intermingled peoples has been too strong; the prestige of the exotic Western political ideology of nationalism has been too potent.  In the Lebanon, as well as in Cyprus, a regime requiring cooperation between different ex-Ottoman nationalities is something of a *tour de force,* as the recent civil war in the Lebanon showed.  In Cyprus it would be utopian to hope that the lion and the lamb will lie down together, and that a little child will lead them.  The truth is that there are no ex-Ottoman lambs; the ex-Ottoman peoples are all lions or tigers.

"It looks then as if in Cyprus the price of political stabilization is going to be the segregation of intermingled nationalities that are irreconcilable."  Washington Post, Jan. 11, 1964, p. A8.

groups has electoral districts from which only a member of that faith can be chosen for the legislature.[11]

Racial electoral registers, like religious ones, have no place in a society that honors the Lincoln tradition—"of the people, by the people, for the people." Here the individual is important, not his race, his creed, or his color. The principle of equality is at war with the notion that District A must be represented by a Negro, as it is with the notion that District B must be represented by a Caucasian, District C by a Jew, District D by a Catholic, and so on. Cf. *Gray* v. *Sanders,* 372 U. S. 368, 379. The racial electoral register system weights votes along one racial line more heavily than it does other votes. That system, by whatever name it is called, is a divisive force in a community, emphasizing differences between candidates and voters that are irrelevant in the constitutional sense. Of course race, like religion, plays an important role in the choices which individual voters make from among various candidates.[12] But government has no business designing electoral districts along racial or religious lines. We held in *Akins* v. *Texas,* 325 U. S. 398, 403, and in *Brown* v. *Allen,* 344 U. S. 443, 471, that courts in selecting juries need not—indeed should not—give each jury list the proportional racial complexion that the community

---

[11] The 1927 Lebanese Constitution established a unicameral legislature. See II Patai, The Republic of Lebanon (1956), p. 533. The number of deputies now is 99. Statesman's Year-Book 1963–1964, p. 1222. Prior to that increase it had 66 members elected according to the following proportional division among religious groups: 20 Maronites; 26 Moslems, of whom 12 were Shi'ites; 7 Greek Orthodox; 4 Druses; 4 Greek Catholics; 3 Armenian Orthodox; 1 Armenian Catholic; 1 other religious minority. 17 Encyclopedia Americana (1963), p. 175. See I Khalil, The Arab States and the Arab League (1962), pp. 124, 133; Ziadeh, The Lebanese Elections, 14 Middle East J. 367 (1960).

[12] See Dawidowicz and Goldstein, Politics in a Pluralistic Democracy (1963).

has. If race is not a proper criterion for drawing a jury list, how can it be in designing an electoral district?

In *Anderson* v. *Martin,* 375 U. S. 399, we barred Louisiana from putting on a ballot opposite a Negro candidate's name the word, "Negro," as it was a device encouraging racial discrimination. When we said in that case that a State may not encourage its citizens "to vote for a candidate solely on account of race," *id.,* at 404, I had assumed that we would hold *a fortiori* that no State could make an electoral district out of any racial bloc unless the electoral unit represented an actual neighborhood. Yet we violate that principle here.

When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan. Since that system is at war with the democratic ideal, it should find no footing here.

"Separate but equal" and "separate but better off" have no more place in voting districts than they have in schools, parks, railroad terminals, or any other facility serving the public.

Mr. Justice Goldberg, with whom Mr. Justice Douglas joins, dissenting.

I fully agree with and join what my Brother Douglas has written in dissent but wish to add these words by way of comment on the Court's opinion.

The question for decision in this case is whether appellants have sustained their burden of proving that the boundaries of the Seventeenth and Eighteenth Congressional Districts of New York were purposefully drawn on racial lines. The Court resolves this question against appellants by accepting "the District Court's finding that

appellants have not shown that the challenged part of the New York Act was the product of a state contrivance to segregate on the basis of race or place of origin." *Ante,* at 58.

My difficulty with this conclusion is that the record does not support the Court's treatment of the District Court's finding. The District Court was a three-judge court and the three judges did not agree upon and, as a court, made no express findings of fact. Instead there were three separate and differing opinions. Judge Moore implied that racially segregated voting districts are constitutional absent a showing of serious under-representation or other specific harm to the individual complainants. 211 F. Supp. 460, 467–468. He also suggested that segregated voting districts could be constitutionally justified because they may enable persons of the same race or place of origin "to obtain representation in legislative bodies which otherwise would be denied to them." *Id.,* at 467. Finally, Judge Moore intimated that factually segregated voting districts would be unconstitutional only where the legislature was "motivated or influenced" to create such districts. *Ibid.* To establish this motivation or influence complainants must introduce proof, and in this case no such proof was tendered by the appellants who, therefore, failed to make a case "upon the facts and the law." *Id.,* at 468.

Judge Moore did not in my view apply the proper constitutional standard. The Constitution, I strongly believe, proscribes state-sanctioned racial segregation in legislative districting as well as in voting and in public schools and facilities. *E. g., Brown* v. *Board of Education,* 347 U. S. 483; *Gomillion* v. *Lightfoot,* 364 U. S. 339; *Johnson* v. *Virginia,* 373 U. S. 61; *Watson* v. *City of Memphis,* 373 U. S. 526; *Goss* v. *Board of Education,* 373 U. S. 683; *Anderson* v. *Martin,* 375 U. S. 399. Certainly in these areas the Fourteenth Amendment "nul-

lifies sophisticated as well as simple-minded modes of discrimination." Cf. *Lane* v. *Wilson,* 307 U. S. 268, 275. This Court has declared state-sanctioned segregation invalid on the ground that, under the Constitution, distinctions by law between citizens because of their race, ancestry, color or religion "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi* v. *United States,* 320 U. S. 81, 100. Given this settled principle that state-sanctioned racial segregation is unconstitutional *per se,* a showing of serious under-representation or other specific harm to individual complainants is irrelevant. I understand the Court's decisions since *Brown* v. *Board of Education, supra,* to hold that harm to the Nation as a whole and to whites and Negroes alike inheres in segregation. The Fourteenth Amendment commands equality, and racial segregation by law is inequality. Judge Moore, therefore, did not apply the proper constitutional standard.

Furthermore, as I shall point out, Judge Moore also erred in holding that in any event appellants' proof was insufficient to establish a prima facie case of unconstitutional racial districting.

Judge Feinberg disagreed both with Judge Moore's implication that segregated voting districts are constitutional absent serious under-representation and with the view that segregated districts could be constitutionally justified by alleged advantages to persons of a particular race or place of origin. Judge Feinberg stated that the "constitutional vice would be use by the legislature of an impermissible standard, and the harm to plaintiffs that need be shown is only that such a standard was used." 211 F. Supp., at 468. He then frankly acknowledged that:

"The case is a closer one for me than the opinion of Judge Moore would indicate it is for him. Plain-

tiffs did introduce evidence which might justify an inference that racial considerations motivated the 1961 reapportionment of congressional districts in Manhattan. However, other inferences . . . are equally or more justifiable. Plaintiffs have a difficult burden to meet in attacking the constitutionality of this state statute." *Id.,* at 469.

Judge Feinberg, on this reasoning, cast his vote for Judge Moore's result on the ground that appellants failed to sustain the "difficult burden" of attacking the constitutionality of this statute: Even where such racially segregated districting results and complainants' evidence "might justify an inference that racial considerations motivated" the districting, still complainants fail to sustain their burden unless they also disprove every other permissible or reasonable purpose which the legislature might have had in mind.

Judge Murphy, in his dissent, agreed with Judge Feinberg as to the applicable constitutional standard. But, on Judge Murphy's view of the record, the appellants carried their burden of proving that "the legislation was solely concerned with segregating white, and colored and Puerto Rican voters by fencing colored and Puerto Rican citizens out of the 17th District and into a district of their own (the 18th)"; that the legislation had effected "obvious segregation"; and that the statute constituted a "subtle exclusion" of Negroes from the Seventeenth and a "jamming in of colored and Puerto Ricans into the 18th or the kind of segregation that appeals to the intervenors." *Id.,* at 473–475. Accordingly, Judge Murphy thought appellants had met their burden of proving segregation and, in the absence of any proof by the State or by intervenors, were entitled to a judgment declaring the statute unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.

In light of these conflicting opinions and analyses, this case cannot be fairly decided on the ground stated in the opinion of the Court, *viz.*, that "[w]e accept the District Court's finding." *Ante,* at 58. Which finding and under what constitutional standard—Judge Moore's, Judge Feinberg's or Judge Murphy's? Judges Moore and Feinberg, who comprised the majority below, differed both with regard to the constitutional standard and, as I read the opinions, with regard to the proof. It should not be forgotten that the conclusions of the District Court—both as to law and fact—have not been reviewed by an intermediate appellate tribunal. Instead the case has come directly to this Court from a three-judge District Court and presents a record containing variant and inconsistent legal and factual conclusions. Even where a three-judge District Court has made a unanimous finding of fact, this Court has given that finding less deference where, as here, it depends on evidence that is largely documentary and particularly where, as here, "the crucial issues involve mixed questions of law and fact." *United States* v. *United States Gypsum Co.,* 333 U. S. 364, 396. In my view, we cannot, in light of the record in this case, rest our decision on the "finding" of the District Court without abdicating our responsibility for principled constitutional adjudication.

My Brother DOUGLAS in his dissent has set forth the virtually undisputed facts. I shall not repeat them here. He has also set forth the correct constitutional standard which I believe we should unhesitatingly reaffirm and apply. On the basis of the evidence,[1] I agree with Judge

---

[1] Judge Murphy in his dissent stated:

"The uncontradicted proof submitted by plaintiffs, however, establishes a visual figure picture of the end results of the recent redistricting of Manhattan Isle (New York County) as follows:

"Manhattan has a population of 1,698,281 people and is entitled to four congressmen. The census figures of 1960 divided the ethnic

Murphy's conclusion "that the only available inference from the . . . uncontradicted figure picture establishes *per se* a *prima facie* case of a legislative intent to draw congressional district lines in the 17th and 18th Districts on the basis of race and national origin." *Id.,* at 472–473. At least, however, appellants' proof made it appear

groups into only two classes—white and non-white and Puerto Rican. These classes have been counted and according to the census 1,058,589 or 62.3% are white and 639,622 or 37.7% are non-white and Puerto Rican.

"The district lines as fixed by Chapter 980 created the four districts in question with the following make-up:

| District | Total Population | White Population % of District | | Non-White and Puerto Rican Origin Population of District | |
|---|---|---|---|---|---|
| 17th | 382,320 | 362,668 | 94.9% | 19,652 | 5.1% |
| 18th | 431,330 | 59,216 | 13.7% | 372,114 | 86.3% |
| 19th | 445,175 | 318,223 | 71.5% | 126,952 | 28.5% |
| 20th | 439,456 | 318,482 | 72.5% | 120,974 | 27.5% |
| Total | 1,698,281 | 1,058,589 | 62.3% | 639,692 | 37.7% |

"The following table shows the percent of non-white persons and persons of Puerto Rican origin in each congressional district in relation to the total number of such persons in the entire county:

| District | % of Non-White and Puerto Rican of County |
|---|---|
| 17th | 3.1% |
| 18th | 58.2% |
| 19th | 19.8% |
| 20th | 18.9% |
| | 100.0% |

"The figure picture of the 17th District shows that the lines as drawn encompass a population 94.9% white and 5.1% non-white and Puerto Rican. It further shows it has a population of 382,320 people, or between 15.4% and 12% less than any of the adjoining districts. The 18th District encompasses. a population that is 86.3% non-white and Puerto Rican and only 13.7% white. Its population of 431,330 people is 12% more than the 17th and 5% above the state average." 211 F. Supp. 460, 472.

probable that a racial criterion shaped the 1961 reapportionment and that an inference of reliance on such an impermissible criterion was more reasonable than an inference that other factors alone had been used. In my view, then, this justifiable inference was sufficient to raise a rebuttable presumption of unconstitutionality and, without shifting the ultimate burden of proof, to place on the State the burden of going forward and introducing rebuttal evidence. See Note, 72 Yale L. J. 1041, 1056–1061. It might be that the appellees and intervenors could have offered proof to counteract the inference of racial districting, but they chose not to do so. They might, for example, have attempted to prove that the lines were drawn in an attempt to equalize the population of districts or to follow neighborhood lines. The simple answer is that appellees made no attempt whatever to rebut the inference that race was a criterion in—or racial segregation a purpose of—the districting.[2]

The question therefore recurs: What more need appellants have proved? Judge Moore apparently would have required them to introduce proof that the legislature's actual motive was to create racially segregated voting districts. Appellants, however, by their evidence established a pattern of segregation not adequately explained on a geometric, geographic, equalization, party-compromise, neighborhood or other basis. To require a showing of racial motivation in the legislature would place an impossible burden on complainants. For example, in this case the redistricting bill was recommended and submitted to the legislature on November 9, 1961, passed on November 10, 1961, and signed by the Governor on that date. No public hearings were had on the bill and no

---

[2] In fact the State in its brief in this Court candidly asserts "that a Legislature may 'consider' race in drawing Congressional district lines and . . . that there is no per se prohibition against classifications by race."

statements by the bill's managers or published debates were available. Under these circumstances, appellants' evidence, showing the factual pattern of segregation outlined by MR. JUSTICE DOUGLAS and by Judge Murphy, was sufficient to establish a prima facie case of unconstitutional racial districting. Once this had been done, appellees should have introduced evidence negating the inference that racial segregation was a purpose of the districting. In the absence of such proof by the State, I am compelled to conclude that racial segregation was a criterion in—or a purpose of—the districting of New York's Seventeenth and Eighteenth Congressional Districts. I, therefore, respectfully dissent.