Frank BRANTLEY, et al., Plaintiffs,

v.

Dolan E. BROWN, et al., Defendants.

Civ. A. No. CV682–030.

United States District Court,
S.D. Georgia,
Swainsboro Division.

Oct. 29, 1982.

---

John H. Ruffin, Jr., Augusta, Ga., for plaintiffs.

Jerry N. Cadle, Rountree & Cadle, Swainsboro, Ga., E. Freeman Leverett, Elberton, Ga., for defendants.

## MEMORANDUM OF OPINION

BOWEN, District Judge.

This is an action pursuant to 42 U.S.C. § 1983 in which the plaintiffs seek declaratory and injunctive relief. The plaintiffs claim that they, as black citizens of Emanuel County, Georgia, are being denied the opportunity to participate effectively in the election of the members of the Emanuel County Board of Education. The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331(a), 1343(3), 1343(4) and 2201. Before the Court is the plaintiffs' motion to enjoin the school board election which is scheduled for November 2, 1982.

It is well settled that the granting of a preliminary injunction rests within the sound discretion of the Court. The Court's discretion, however, must be exercised in light "the four prerequisites for the extraordinary relief of preliminary injunction[.]" *Allison v. Froehlke,* 470 F.2d 1123, 1126 (5th Cir.1972). The four prerequisites are:

> (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the opponent; and (4) that granting the preliminary injunction will not disserve the public interest.

*West Point-Pepperell, Inc. v. Donovan,* 689 F.2d 950 (11th Cir.1982); *Compact Van Equipment Co. v. Leggett and Platt, Inc.,* 566 F.2d 952 (5th Cir.1978); *Canal Authority v. Callaway,* 489 F.2d 567 (5th Cir.1974). A preliminary injunction may issue only if the movant carries the burden of persuasion as to *all* of these four prerequisites. *Commonwealth Life Insurance Company v. Neal,* 669 F.2d 300 (5th Cir.1982); *Southern Monorail Co. v. Robbin & Meyers, Inc.,* 666 F.2d 185 (5th Cir.1982); *Martin v. Attaway,* 506 F.Supp. 603 (S.D.Ga.1981).

On October 26, 1982, this Court conducted an evidentiary hearing in order to allow the plaintiffs to present evidence supporting their motion for a preliminary injunction and to allow the defendants an opportunity to show cause why the injunctive relief sought by the plaintiffs should not be granted. The Court has carefully sifted the evidence presented at that hearing and concludes that the plaintiffs have failed to make a showing sufficient to justify the extraordinary relief which they have requested.

## I. *Likelihood of Success on the Merits*

Although the trial of this action on the merits was not consolidated pursuant to Rule 65(a)(2), Fed.R.Civ.P. with the hearing on the plaintiffs' motion for a preliminary injunction, the Court heard sufficient evidence at the October 26, 1982 hearing to make detailed findings which show that there is little likelihood that the plaintiffs will ultimately prevail on the merits of this case. That hearing made it clear that the gist of the plaintiffs' complaint is that the seven districts from which the members of the Emanuel County Board of Education are scheduled to be elected on November 2, 1982, were intentionally drawn to dilute the voting strength of the black citizens of Emanuel County.[1] Although conceding that blacks are not entitled to proportional representation, the plaintiffs argue that the districts in question were drawn so to concentrate blacks into one district and to thus minimize black votes strength by insuring that no more than one black board member will be elected.

Prior to 1970, the Emanuel County Board of Education was selected by the grand jury of that county. In 1970 an Act was passed by the Georgia General Assembly which provided for a referendum election in Emanuel County to give Emanuel County voters the opportunity to increase the number of members of their board of education to seven and to elect the seven members, who would be required to reside in specific districts, on a county-wide basis. Ga. Laws 1970, p. 2153. The proposed changes contained in the referendum were approved by the voters of Emanuel County and a county-wide election scheme has been utilized since 1970.

Beginning in June of 1980, representatives of the black community began to petition the board of education to adopt some mechanism to provide for black representation on the board since black voters had been unable to elect a board member. In response to these requests, and having discovered that the 1970 county-wide election plan had never been precleared by the United States Attorney General as required by Section 5 of the Voting Rights Act of 1965, the board unanimously adopted a new election plan which provided for the election of board members from seven single-member election districts. The plan was introduced as local legislation at the 1982 session of the Georgia General Assembly. After passing in both houses, the plan was approved by the Governor on April 12, 1982. Ga.Laws 1982, p. 4049. The plan was subsequently ratified by the voters of Emanuel County as required by Georgia law in a referendum which was held on June 1, 1982. The new plan received preclearance by the United States Attorney General on August 30, 1982. It is this precleared single-member district plan which the plaintiffs now attack.

As Mr. Justice Stevens noted in his concurring opinion in *Mobile v. Bolden*, 446 U.S. 55, 83, 100 S.Ct. 1490, 1508, 64 L.Ed.2d 47 (1980), "there is a fundamental distinction between state action that inhibits an individual's right to vote and state action that affects the political strength of various

---

1. The plaintiffs also assert that their right to due process under the law was violated because the referendum which was presented to Emanuel County voters on June 1, 1982 was confusing. This contention is not supported by the evidence. The referendum was thoroughly explained in the Emanuel County press and the wording of the issue on the ballot was clear. The Act under which the referendum was held explicitly provided that failure to approve the single-member district plan would result in the board of education being selected by the Emanuel County grand jury. Ga.Laws 1982, p. 4049.

Neither is there merit to the plaintiffs' argument that it was unfair to submit the proposed change in the method of selecting board members to the voters in Emanuel County. The referendum was required by Georgia law. There is no evidence that black voters were deterred in any way from voting for or against the referendum. "[T]he very purpose of the secret ballot is to protect the individual's right to cast a vote without explaining to anyone for whom [or what], or for what reason, the vote is cast." *Rogers v. Lodge*, —— U.S. ——, —— n. 30, 102 S.Ct. 3272, 3291 n. 30, 73 L.Ed.2d 1012 (Stevens J., dissenting). This Court will not inquire into the state of mind of the entire Emanuel County electorate. The real issue in this case is whether the single-member district plan, regardless of how it was formally adopted, was devised for a discriminatory purpose.

groups that compete for leadership in a democratically governed community." "One man, one vote" cases which seek to insure that each individual's vote is given equal weight, *see Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) must be distinguished from cases such as the present action which deal with the group oriented problem of the gerrymander which is constructed within the constraints imposed by the one man, one vote standard. It is in the realm of the equipopulous gerrymander that the courts are in desperate need of some satisfactory criteria for judicial determination. The search for objective criteria has been a prime concern of Mr. Justice Stevens in both *Mobile v. Bolden,* 446 U.S. 55, 83–94, 100 S.Ct. 1490, 1508–13, 64 L.Ed.2d 47 (1980) (concurring opinion) and *Rogers v. Lodge,* —— U.S. ——, —————, 102 S.Ct. 3272, 3283–94, 73 L.Ed.2d 1012 (1982) (dissenting opinion). Several commentators have observed the problem. Specifically, it has been noted that

> [t]he problem of discriminatory delineation of representational district boundaries has been ... an area virtually free from judicial supervision. Underlying this serious weakness in the judiciary's performance is the fact that "no precise mathematical formula for defining gerrymandering is readily available." While simple mathematics was of tremendous assistance in clarifying the malapportionment issue, the absence of such quantitative assistance on the gerrymandering issue has resulted in its description as a "qualitative" vote dilution problem, and therefore more difficult to resolve.

Engstrom, *The Supreme Court and Equipopulous Gerrymandering: A Remaining Obstacle in the Quest for Fair and Effective Representation,* 1976, Ariz.St.L.J. 277, 314 (footnotes omitted) "Every districting plan has a natural negative effect on some voters; and given the difficulty of predicting this natural effect, the Court has been unable to define as gerrymander any plan which exceeds by some percentage this unascertained natural level of dilution." Note, *An Answer to "the Other Half of* Reynolds v. Sims", 14 Ga.L.Rev. 813, 817 (1980).

■ While not providing an objective standard by which to identify a gerrymander, the Court has provided some limited guidance to the lower courts in ruling, that proportional representation is not to be expected from districting plans and that such representation, therefore, is not required. *Id.* at 817 n. 20; *see Chapman v. Meier,* 420 U.S. 1, 17, 95 S.Ct. 751, 761, 42 L.Ed.2d 766 (1975); *White v. Regester,* 412 U.S. 755, 765–66, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 140–50, 91 S.Ct. 1858, 1865–72, 29 L.Ed.2d 363 (1971). Indeed, since the courts must be concerned not only with racial gerrymanders, but with "those aimed at religious, ethnic, economic, and political groups as well"[,] *Mobile v. Bolden,* 446 U.S. 55, 86, 100 S.Ct. 1490, 1514, 64 L.Ed.2d 47 (1980) (Stevens, J., concurring), it is difficult to see how any district system of voting with winner-take-all elections could ever achieve any entirely satisfactory mix of representation.[2] The problem involved in seeking to secure proportional representation for all of the groups within a pluralistic society seems insurmountable. *See Mobile v. Bolden,* 446 U.S. 55, 78–79 n. 26, 100 S.Ct. 1490, 1505–06 n. 26, 64 L.Ed.2d 47 (1980). Fortunately, in order to rule on the present controversy,

---

**2.** Of course, the use of a multi-member district system of voting with provision for a single transferable vote would allow "each voter to choose which group affiliation, racial or otherwise, will influence his ballot." Note, *An Answer to "the Other Half of* Reynolds v. Sims", 14 Ga.L.Rev. 813, 829 (1980). Under such a pure proportional representation system of voting, any interest groups which could draw a certain quota of votes would be assured of electing a representative. *See* E. Lakeman,

How Democracies Vote (1970). While the courts do not have the authority to mandate such a system of voting, it should be recognized that "[a] precondition of gerrymandering is use of a district system for election of legislators [or school board members], or, of course, use of a winner-take-all at-large system. It cannot occur in a pure proportional representation system." R. Dixon, Democratic Representation: Reapportionment In Law And Politics, 462 (1968).

the Court does not need to wade into the "voracious political thicket" which Justice Stevens has aptly identified in his recent opinions. The Court is bound by the subjective intent test which evidently has been accepted by a majority of the members of the Supreme Court. *See Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982).

■ Under the Supreme Court's current analysis, the plaintiffs must show that the Emanuel County single-member district plan was "conceived ... as [a] purposeful devic[e] to further racial ... discrimination." *Whitcomb v. Chavis,* 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971); *see Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Wright v. Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964).[3] " 'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences .... It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of', not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2299, 60 L.Ed.2d 870 (1979) (footnotes omitted). Of course, the necessary discriminatory purpose need not be proven by direct evidence. "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, in-cluding the fact, if it is true, that the law bears more heavily on one race than another." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976).

At the October 26, 1982, hearing, I heard testimony from both Walter Rountree, a leading member of the Emanuel County black community who attended several meetings of the Emanuel County Board of Education in his capacity as president of the Swainsboro-Emanuel County Chapter of the NAACP, and Mr. Bonnie F. Ogburn, the individual who chaired the Emanuel County Board of Education during its discussions of reapportionment. Their testimony failed to reveal any direct evidence that the current single-member district plan of election was formulated with the intent of minimizing black voter strength. Likewise, there is no direct evidence of discrimination in the official minutes of the Emanuel County Board of Education.

In assessing the circumstantial evidence of discrimination in this case, I must note that the plaintiffs have failed to come forward with the sort of evidence which was presented in *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) to show "the impact of past discrimination on the ability of blacks to participate effectively in the political process." *Id.* at ——, 102 S.Ct. at 3279. Instead, as circumstantial evidence of discrimination, the plaintiffs raised three main points. First the plaintiffs submitted a report made by the Office for Civil Rights, Department of Edu-

**3.** The plaintiffs' have invoked both the fourteenth and fifteenth amendments in their complaint. In *Mobile v. Bolden,* 446 U.S. 55, 65, 100 S.Ct. 1490, 1498, 64 L.Ed.2d 47 (1980), a plurality of the Supreme Court found that the fifteenth amendment "prohibits any purposefully discriminatory denial or abridgment by government of the freedom to vote 'on account of race, color or previous condition of servitude.' " The Court therefore reasoned that since the black citizens of Mobile were able to "register and vote without hindrance," there could be violation of the fifteenth amendment. *Id.* The plurality's conclusion was persuasively questioned by Justice Stevens in his concurring opinion. *Id.* at 84–86, 100 S.Ct. at 1508–09 (Stevens J, concurring). The split in the Court

evidently continues. *Rogers v. Lodge,* —— U.S. ——, ——, n. 6, 102 S.Ct. 3272, 3276, n. 6, 73 L.Ed.2d 1012 (1982).

As there have been no allegations in this case that blacks in Emanuel County have not been permitted to "register and vote without hindrance," this Court will consider this matter only under the fourteenth amendment. Since it is clear "that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminating purpose[,]" *Mobile v. Bolden,* 446 U.S. 55, 62, 100 S.Ct. 1490, 1497, 64 L.Ed.2d 47 (1980), it should be recognized, however, that the analysis of this Court would be the same even if the fifteenth amendment was interpreted so as to apply to the facts of this case.

cation, which was made in response to certain allegations that the Emanuel County School District was discriminating on the basis of race in its employment policies and practices, in its student placement policies and practices and in its treatment of black students. The exhibit was admitted into evidence out of abundance of caution in an effort to review all evidence that might in any way support the plaintiffs claim of discriminatory intent. Although that report does reveal some problem areas, it also shows that many of the allegations which were made against the school district were ill-founded. Standing alone, the report does not reflect a climate of discrimination from which this Court can infer that the defendants in this case [4] intentionally discriminated against members of the black community is drawing the single-member districts now in question.

Second, the plaintiffs pointed out that no black has ever been elected to the Emanuel County Board of Education. In this case, unlike *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), blacks do not make up a majority of the relevant electorate. According to the 1980 United States Census, blacks comprise 32% of the Emanuel County population. No evidence has been presented to the Court to show that blacks in Emanuel County have had any lack of access to the candidate selection process. Indeed, it is uncontroverted that several black candidates have run for positions on the board of education. "It may be that Negro candidates have been defeated, but that fact alone does not work a constitutional deprivation." *Mobile v. Bolden,* 446 U.S. 55, 73, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980).

Finally, the plaintiffs argue that the defendants were unresponsive to the needs of the black community. This allegation is unsubstantiated. The record clearly establishes that the board's meetings were open to the public and that members of the black community were given an opportunity to express their concerns about representation. At the behest of the black community, Rev. Alton F. Tyler was appointed as an *ex officio* member of the board and was notified of all board meetings. In addition, I must conclude that the plan adopted by the board was conceived at least in part in an effort to accommodate the original request of Mr. Rountree of the NAACP that blacks be given a representative on the board.

The method by which the challenged single-member district plan was drawn is fully described in the pleadings as a response to the plaintiffs' interrogatory number 15. It is clear that the board relied on neutral criteria in drawing the seven single-member districts. For the convenience of the county's voters, the board followed Georgia militia district lines and City of Swainsboro ward lines. The defendants' assertion that there is no combination of such lines which could form another school board election district with a majority black population in addition to the one majority black district already constructed, has gone uncontroverted. The districts adopted by the board are compact, contiguous, and give no facial indication of having been manipulated to serve anything other than legitimate purposes.

The failure of the board to adopt the alternative districting plan proposed by the NAACP at the school board's meeting on February 16, 1982, does not indicate any disregard for the interests of the black community.[5] The plan proposed by the

---

**4.** The plaintiffs did not establish the involvement of current defendants in the federal inquiry. The plaintiffs must do more than show some generalized intent to discriminate that exists somewhere in Emanuel County. They must show that specific individuals involved in drawing the single-member district plan which is currently being challenged harbored a discriminatory intent. *Mobile v. Bolden,* 446 U.S. 55, 74 n. 20, 100 S.Ct. 1490, 1503 n. 20, 64 L.Ed.2d 47 (1980).

**5.** It should be noted that there is evidence that other group interests played a part in the board's decision. The seven white members of the Emanuel County Board of Education often voted accordingly to their respective urban or rural interest. Although counsel for the plaintiffs made some argument that the urban vs. rural controversy was really a facade covering more fundamental positions based on the issue

NAACP did not follow ward or militia district lines and would have contributed to voter confusion while making elections difficult to administer. The NAACP's plan also lacked the compactness and contiguity of the board's proposal. Under the totality of the circumstances, I cannot characterize the conduct of the board of education in adopting their own plan in preference to the plan submitted by the NAACP as being "unresponsive and insensitive to the needs of the black community." *Rogers v. Lodge,* —— U.S. ——, ——, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982).

In the final analysis, it is clear that what the plaintiffs are requesting in this case is a form of proportional representation. The plan which was submitted by the NAACP was clearly drawn with the purpose of creating two "safe" black districts instead of the one majority black district contained in the board's plan. As previously noted, "[t]he Equal Protection Clause of the Fourteenth Amendment does not require proportional representation as an imperative of political organization." *Mobile v. Bolden,* 446 U.S. 55, 75–76, 100 S.Ct. 1490, 1504, 64 L.Ed.2d 47 (1980). One reason for the lack of such a requirement is illustrated by the facts of this case.

It simply must be recognized that an apportioning body could be totally receptive to the interests of the black community and still rationally decide that the creation of the sort of "safe" districts which the plaintiffs desire in this case would not be in the long term interest of that community. As Chief Justice Burger noted in *United Jewish Organizations v. Carey,* 430 U.S. 144, 186, 97 S.Ct. 996, 1020, 51 L.Ed.2d 229 (1977) (dissenting opinion), the creation of safe districts

> tends to sustain the existence of ghettos by promoting the notion that political

clout is to be gained or maintained by marshaling particular racial, ethnic or religious groups in enclaves. It suggests to the voter that only a candidate of the same race, religion, or ethnic origin can properly represent that voter's interests, and that such candidate can be elected only from a district with a sufficient minority concentration

A rational nondiscriminatory legislature could also recognize the fact that "the very idea of stacking districts so as to achieve a particular result tends to undermine the democratic process in general by making representatives less sensitive to shifts in public opinion." Note, *An Answer to "the Other Half of* Reynolds v. Sims", 14 Ga.L. Rev. 813, 826 (1980); see Tufte, *The Relationship Between Seats and Votes in Two-Party Systems,* 67 Am.Pol.Sci.Rev. 540 (1973).[6]

In summary, although governing bodies arguably have this right to consciously take racial factors into consideration in an effort to voluntarily achieve a rough sort of proportional representation, *see United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), there are valid nondiscriminatory reasons for not taking such factors into consideration. As Justice Douglas observed:

> When racial or religious lines are drawn by the State, the multiracial, multireligious communities that our Constitution seeks to weld together as one become separatist; antagonisms that relate to race or to religion rather than to political issues are generated; communities seek not the best representative but the best racial or religious partisan. Since that system is at war with the democratic ideal, it should find no footing here."

of race, the Court finds that the disagreements between rural and urban members were not a pretext for racial considerations.

**6.** The gerrymandering of single-member districts is particularly likely to result in the sort of enclaves mentioned by Chief Justice Burger. Although multi-member districts have generally been viewed with disfavor by the courts, it is

possible to achieve minority representation without the creation of such enclaves by simply altering some of the winner-take-all aspects of an otherwise discriminatory multi-member district. *See Mobile v. Bolden,* 446 U.S. 55, 82, 100 S.Ct. 1490, 1507, 64 L.Ed.2d 47 (1980) (Blackmun, J., concurring in result); E. Lakeman, How Democracies Vote (1970).

*Wright v. Rockefeller,* 376 U.S. 52, 67, 84 S.Ct. 603, 611, 11 L.Ed.2d 512 (1964) (dissenting opinion).

After considering all of the evidence in this matter, I can only conclude that the proof offered by the plaintiffs falls far short of showing that the plan under which the November 2, 1982 election is to be held was enacted with the purpose of limiting black voter strength. *Mobile v. Bolden,* 446 U.S. 55, 70, 100 S.Ct. 1490, 1501, 64 L.Ed.2d 47 (1980). The weight of the evidence in this case indicates that the plan was formulated with the neutral and permissible purpose of preserving Georgia militia district lines and City of Swainsboro ward lines. The board was under no obligation to maximize black voting strength. There is not a substantial likelihood that the plaintiffs will succeed on the merits of this action.

## II. *Other Prerequisites*

Although the result in division I of this opinion is depositive of the plaintiffs motion, I find it appropriate to briefly address the remaining three prerequisites for injunctive relief. Since fundamental rights are involved in this case, it is clear that the plaintiffs will be irreparably harmed if the November 2, 1982 election is allowed to proceed and such election ultimately is determined to have violated the plaintiffs' rights. Given the Court's determination that it is unlikely that the plaintiffs will be able to show that the November 2, 1982 election is in violation of their rights, this consideration is largely neutralized.

Seeing that the opponents to the plaintiffs' motion are public officials, the final two prerequisites for injunctive relief (i.e. (3) whether the threatened injury to the movants outweighs the threatened harm an injunction may cause the opponents and (4) whether granting the preliminary injunction will disserve the public interest) can be considered together. In effect, the public interest must be balanced against the threatened injury to the plaintiffs. The public interest in proceeding with the November 2, 1982 election is sub-stantial. The Court heard uncontroverted testimony from Probate Judge Homer Durden that voter turnout in a general election such as the one to be held on November 2, can be expected to be substantially higher than the turnout in the sort of special election which would have to be scheduled if the November 2 election were enjoined. The delay and loss in voter turnout which would result from granting the plaintiffs' motion is clearly not in the public interest. In addition, substantial expense has gone into preparing for the election on November 2, 1982. Being forced to finance a special election in addition to the expenditures already made would place a substantial financial burden on Emanuel County. Under the facts of this case, the public interest outweighs any threatened injury to the plaintiffs. Accordingly, the plaintiffs' motion is DENIED.

Having made my decision, I will append a final comment. Rarely, in a case in which racial discrimination has been alleged is it possible to hear the parties' contentions without detecting a degree of acrimony. The sensitive nature of such allegations as well as the tension produced by the litigation process tend to produce bitterness and ill-will. I have not detected animosity in this action. The parties have been open and candid in their testimony, and have expressed differences. Nonetheless, the attitude of counsel and of those who testified was refreshingly professional and neighborly.