**Frank J. ELLIS, in his own right and on Behalf of numerous other voters of Baltimore City who are similarly situated,**

v.

**MAYOR & CITY COUNCIL OF BALTIMORE CITY and Board of Supervisors of Elections for Baltimore City.**

**Cross Claim of Lawrence S. Best, Intervenor.**

**Civ. No. 14555.**

United States District Court
D. Maryland.

May 3, 1967.

Archie D. Williams, Baltimore, Md., for plaintiff.

Ambrose T. Hartman, Deputy City Sol., Baltimore, Md., for Mayor & City Council.

Edward L. Blanton, Jr., Asst. Atty. Gen., Baltimore, Md., for Supervisors of Elections.

Leon H. A. Pierson, Baltimore, Md., for Best, Intervenor.

THOMSEN, Chief Judge.

This action has run an unusual and tortuous course. Its history through October 1965 is set out in the opinion which Judge Winter wrote for this Court, 234 F.Supp. 945 (1964), and in the opinion of the Fourth Circuit, 352 F.2d 123 (1965).

The original complaint filed in April 1963 challenged on equal protection grounds (one man, one vote) the then existing apportionment of City Councilmen, as prescribed by section 16 of the Charter and Public Local Laws of Baltimore City (1949 ed.). That apportionment will be referred to in this opinion as the Old Plan.

Also in April 1963, a Commission known as the Bard Commission submitted a proposed redistricting plan, which was called Plan X. The City Council proposed, by Resolution No. 9, a modified version of that plan, which became known as Modified Plan X, to be submitted to the voters at the 1964 election.

Plaintiff's second amended complaint challenged both the Old Plan and Modified Plan X, on equal protection (one man, one vote) grounds. This Court concluded that both the Old Plan and Modified Plan X violated that principle and, for reasons set out in Judge Winter's opinion, enjoined the holding of any further elections under the Old Plan, and enjoined the submission of Resolution No. 9 (Modified Plan X) to the voters at the November 1964 election. Judge Winter's opinion concluded:

"We will not undertake a valid reapportionment of the City Council of Baltimore at this time. Under the existing Charter, municipal elections will not again occur until May 1967. If Resoultion No. 1 is adopted, municipal elections will not occur until November, 1967. A general election will be held in November, 1966. There is, therefore, ample time for the City Council to propose a valid scheme of reapportionment and submit it to the voters for adoption before the next municipal election will be held. We will, however, retain jurisdiction of the case pending the adoption and approval by the voters of a valid scheme of reapportionment of the City Council." 234 F.Supp. at 959.[1]

The Fourth Circuit affirmed and remanded the case to this Court to exercise its retained jurisdiction. 352 F.2d 123, 130.

Early in 1966, the Bard Commission reported another reapportionment plan (referred to herein as the Bard Plan) which was never adopted by the City Council.

In May 1966 the City Council proposed, by Resolution No. 1652, a reapportionment plan, known as the Best Plan, named for its sponsor, Councilman Lawrence S. Best, which was submitted to the voters at the November 1966 election.

In July 1966, pursuant to Article XI-A of the Constitution of Maryland, more than 10,000 registered voters of the City of Baltimore duly filed a petition proposing amendments to the Charter, embodying a redistricting plan which came to be known as the Modified Bard Plan. That plan was also submitted to the voters in the November 1966 election.

Meanwhile, plaintiff had filed a petition for further relief, and after sundry mesne proceedings filed an amended petition, in which he attacked both Resolution 1652 (the Best Plan) and the Petition of Registered Voters (the Modified Bard Plan) on grounds which are no longer material, since he dismissed all his claims for relief at the hearing on May 1, 1967.

In August 1966, Councilman Best was granted leave to intervene as a party defendant in order that he might defend the constitutionality of the Best Plan. The Court concluded, however, that no trial of the pending issues should be held before the November 1966 election.

---

1. Resolution No. 1 was adopted, and the next municipal election will be held in November 1967.

At that election the voters rejected Resolution No. 1652 (the Best Plan) and adopted the Amendment proposed by the Petition of Registered Voters (the Modified Bard Plan).

In January 1967 Best filed an amended answer and cross-claim, in which he attacked the Modified Bard Plan on the ground of racial gerrymandering. Best's amended cross-claim alleges that the Modified Bard Plan

" * * * does deliberately and purposely manipulate the district lines so as to include voters of the white race and exclude voters of the negro race and vice versa in several of the six districts, to the end, intent and effect that the City of Baltimore will be divided into racially segregated Councilmanic Districts."

At the hearing on the amended cross-claim held on May 1, 1967, a stipulation of facts and a number of exhibits were filed, on which all parties submitted their case.[2] The stipulated facts do not support the allegation of the amended cross-claim, quoted above.

The Health Department of Baltimore City reports that as of April 27, 1967, the total population of Baltimore City is about 914,000, consisting of 538,000 whites (59%) and 376,000 non-whites (41%). The percentage of registered voters as of March 23, 1967, is 65% white, 35% non-white.

The voter registration figures under the Old Plan (under which the present City Council was elected in 1963), using March 1967 registration figures, essentially the same as the 1966 figures, show:

| District | White Registrants | Non-White Registrants | Total Registrants | % White | % Non-White | Total Population 1960 Census |
|---|---|---|---|---|---|---|
| First | 33,861 | 3,774 | 37,635 | 90% | 10% | 94,761 |
| Second | 15,355 | 14,870 | 30,225 | 50.8% | 49.2% | 84,213 |
| Third | 117,668 | 21,451 | 139,119 | 84.6% | 15.4% | 278,759 |
| Fourth | 13,776 | 33,921 | 47,697 | 28.8% | 71.2% | 118,339 |
| Fifth | 52,922 | 54,882 | 107,804 | 49.4% | 50.6% | 223,417 |
| Sixth | 33,576 | 13,687 | 47,262 | 71.4% | 28.6% | 139,535 |

Under the Old Plan the Third and Fifth Districts had four Councilmen, the other Districts three. Obviously, a large number of precincts had to be transferred from one district to another in order to meet the one man, one vote principle if the district system was to be retained and the Council was to be kept to a reasonable size. Those who proposed the Modified Bard Plan called for

2. The stipulated evidence includes maps and other data with respect to (1) the Old Plan, which was in effect until declared unconstitutional in 1964; (2) Modified Plan X, also declared unconstitutional in 1964; (3) the Bard Plan, reported by the Bard Commission in 1966, but not adopted by the City Council; and (4) the Modified Bard Plan, proposed by the Petition of Registered Voters and adopted at the November 1966 election. No evidence was offered with respect to the provisions of the Best Plan, which was defeated at the November 1966 election.

The population according to the 1960 census and the total registration in the districts provided by the Old Plan are set out in Judge Winter's opinion, 234 F.Supp. at pp. 949–950. Similar figures for Modified Plan X are set out at p. 956. They show that very substantial changes had to be made to meet the one man, one vote principle. No one contends that the Modified Bard Plan, adopted by the voters, fails to meet that test.

six approximately equal districts, each with three Councilmen. That result could not have been accomplished without altering in some way the racial composition of the districts, since every transfer of a precinct from one district to another alters the ratio in some way. The Modified Bard Plan, adopted by the voters in November 1966, solved the problems fairly. Its figures show:

| District | White Regis- trants | Non- White Regis- trants | Total Regis- trants | % White | % Non- White | Total Popu- lation 1960 Census |
|----------|-------|--------|--------|---------|--------|--------|
| First | 54,347 | 7,061 | 61,408 | 88.5% | 11.5% | 158,429 |
| Second | 28,035 | 33,656 | 61,691 | 45.7% | 54.3% | 163,985 |
| Third | 92,156 | 660 | 92,816 | 92.8% | 7.2% | 158,086 |
| Fourth | 13,353 | 51,489 | 64,842 | 20.5% | 79.5% | 155,692 |
| Fifth | 48,726 | 28,899 | 77,625 | 63% | 37% | 151,212 |
| Sixth | 30,540 | 20,803 | 51,343 | 59.5% | 40.5% | 151,620 |

In short, the Old Plan districts had large white majorities of registered voters in three districts, a large non-white majority in one, with two districts about even. Under the Modified Bard Plan, the three old districts with large white majorities still have large white majorities, and the one old district with a large non-white majority still has a large non-white majority. The Plan results in a white majority in one of the even districts and a non-white majority in the other. In view of the population ratio (59–41) and the ratio of registered voters (65–35), any other result than a white majority in four districts and a non-white majority in two would have been subject to serious question.

There is no geographical gerrymandering. The several districts are compact. The only contention to the contrary is based upon the shift of Ward 24 from District 6 to District 1: Ward 24 is a point of land separated from most of District 1 by the Northwest Branch of the Patapsco River and from most of District 6 by the Middle Branch of that river. It is connected with the rest of District 1 by Ward 22 and with the rest of District 6 by Ward 23. District 1 includes the north side of the harbor and District 6 the south side. District 1 had to be greatly enlarged to meet the one man, one vote principle. The inclusion of Ward 24 in District 1 was not unreasonable, did not cause geographical gerrymandering, and was not shown to have been done for racial reasons.

Cross-claimant complains because Ward 18 was "transferred" to District 6 from District 1. Ward 18 was in District 6 in the Old Plan and Modified Plan X. It was transferred to District 1 in the Bard Plan, which was never approved by the Council or the voters. It was kept in (or returned to) District 6 in the Modified Bard Plan. Both District 1 and District 6 had and retain large white majorities.[3]

3. In the cross-claim and in the brief in support thereof, cross-claimant cites ten other instances in which he claims precincts were transferred from one district to another "to segregate white voters and to dilute their voting strength". No proof of such intention was offered, and no improper result was proved. The instances selected by cross-claimant must be considered in the light of the many transfers of precincts from one district to another in the several plans; sometimes a precinct remained in the new district to which it had been transferred in

The Court finds that cross-claimant failed to prove that the registered voters who proposed the Modified Bard Plan, which was adopted at the November 1966 election, were motivated by racial considerations, or that the districts were drawn on racial lines in that Plan. No "racial gerrymandering" or any other violation of the constitutional rights of cross-claimant or any other person has been proved. Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964). This case is entirely different from Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), relied on by cross-claimant.

Judgment will be entered decreeing that the councilmanic districts established by the petition (Modified Bard Plan) approved by the voters in the election held in November 1966 be declared valid and constitutional, and that the relief prayed in the cross-claim of intervenor, Lawrence S. Best, be denied.

a previous plan; sometimes it was returned to its old district.

(1) Precincts 30 to 33 (mostly white) of Ward 26, which had been well within District 3 in the Old Plan, were transferred to District 2 in Mod. X. In both Bard and Mod. Bard, Precincts 30 and 31 were transferred to District 1, which had to be enlarged, and 32 and 33 were returned to District 3.

(2) Precincts 95 to 97 and 99 (mostly white) in Ward 27 (erroneously referred to as Ward 28 in the amended cross-claim), which had been in District 5 in the Old Plan were transferred to District 4 in Mod. X, but were kept in District 5 in both Bard and Mod. Bard.

(3) Precinct 2 (mostly white) in Ward 8, which had been in District 3 in the Old Plan, was transferred to District 2 in Mod. X, but was kept in District 3 in both Bard and Mod. Bard.

(4) Precincts 8, 16 and 17 (mostly colored) of Ward 16, which had been in District 5 in the Old Plan and Mod. X were transferred to District 4 in Bard and Mod. Bard. Since all districts are to have three councilmen in Mod. Bard, there had to be some increase in the size of District 4 vis-a-vis District 5. The precincts in question straightened the line of District 4.

(5) Similar reasons were the apparent and proper basis for the transfer of Precincts 1 to 6 (mostly white) of Ward 6 from District 2 to District 1 in Mod. Bard.

(6) Similar reasons were the apparent and proper basis for Mod. Bard's retaining Precincts 1 to 3 (mostly white) of Ward 12 in District 3, where they had been in the Old Plan, although they had been transferred to District 2 in Mod. X and Bard.

(7) Different arguments are made in the cross-claim and supporting brief with respect to Precincts 1 to 13 and 3 to 26 (mostly colored) of Ward 8. All but 18 to 22 were originally in District 3. Mod. X and Bard contained the nearest thing to a geographical gerrymander in any of the four plans, retaining Precincts 1 and 4 to 13 in District 3. Mod. Bard transferred all but 1 and 2 to District 2, obviously as part of the plan to reduce the size of District 3. The lines in this area are quite regular, and the argument in cross-claimant's brief that the lines would have been improved by transferring Precincts 1 and 2 to District 2 is not supported by the map. The transfer of Precincts 1 and 2 to District 2 would have created a narrow triangular projection into District 3.

(8) Precincts 13 to 15 (mostly white) of Ward 20 were in District 5 in the Old Plan, were transferred to District 6 in Mod. X, but were kept in District 5 in both Bard and Mod. Bard.

(9) The argument with respect to Precincts 1 to 6 and 16 to 24 in Ward 20 is hard to follow. The white-non-white voter registration is about even; all the precincts except 19 and 20 were kept in District 5 in Mod. X, but were transferred to District 6 in both Bard and Mod. Bard. District 6 still has a large white majority.

(10) Precincts 1 to 6 of Ward 18 (mostly white) were in District 6 in the Old Plan and in Mod. X, were transferred to District 1 in Bard, but kept in District 6 in Mod. Bard.

No racial pattern in the transfers has been proved. As the Supreme Court said in Wright v. Rockefeller, 376 U.S. at 57, 84 S.Ct. 603, at 605, 11 L.Ed.2d 512: "Where there are such conflicting inferences one group of them cannot, because labeled as 'prima facie proof,' be treated as conclusive on the fact finder so as to deprive him of his responsibility to choose among disputed inferences."