Vernon N. **DOBSON** et al.

v.

The **MAYOR AND CITY COUNCIL OF BALTIMORE CITY** et al.

and

**John C. Donohue, President, et al.**

**Civ. No. 71–772.**

United States District Court,
D. Maryland.

Aug. 23, 1971.

Wilbur D. Preston, Jr., Norwood B. Orrick, Larry S. Gibson and Robert Emmett Sharkey, Baltimore, Md., for plaintiffs.

George L. Russell, Jr., City Sol., Ambrose T. Hartman, Deputy City Sol., and Allan B. Blumberg and Carol S. Sugar, Asst. City Sols., Baltimore, Md., for the defendant Mayor and City Council of Baltimore.

Francis B. Burch, Atty. Gen., and E. Stephen Derby, Asst. Atty. Gen., Baltimore, Md., for the defendant Board of Supervisors of Elections of Baltimore City.

HARVEY, District Judge:

In this civil action, eight black residents of the City of Baltimore seek to enjoin the holding of certain impending elections for City Council, namely, a primary election scheduled for September 14, 1971 and a general election scheduled for November 2, 1971.[1] In their complaint, plaintiffs assert the unconstitutionality of a recent redistricting Ordinance, No. 1023, of the Mayor and City Council of Baltimore, dated April 1, 1971, claiming that this enactment denies plaintiffs rights guaranteed to them by the Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution.[2] Named collectively and indi-

---

1. Plaintiffs bring this action on their own behalf and as a class action under Rule 23, Federal Rules of Civil Procedure, on behalf of all other Negro citizens residing in the City and eligible to participate in City elections.

2. It is alleged that at least one of the plaintiffs resides in each of the six councilmanic districts in the City.

vidually as defendants are the Mayor and the present members of the City Council of Baltimore and the President and members of the Board of Supervisors of Elections of Baltimore City.

Plaintiffs claim that Ordinance No. 1023, which redistricted the City into new councilmanic election districts as required by the Baltimore City Charter, amounts to unconstitutional racial gerrymandering. A declaratory judgment and an injunction are sought prohibiting primary and general elections for City Councilmen until a new redistricting plan has been adopted by the City Council or by this Court if the City Council refuses to act.[3] Plaintiffs are not asking this Court to enjoin the primary and general elections for the office of Mayor, President of the City Council and Comptroller. These city-wide elections, which were not affected by the division of the City into new councilmanic election districts by Ordinance No. 1023, will proceed whatever the outcome here.

On behalf of the Mayor and City Council, the City Solicitor has filed a motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure, claiming that the plaintiffs are barred by laches. Inasmuch as various affidavits and exhibits were filed in support of this motion, it has been treated herein as a motion for summary judgment. The defendants who constitute the Board of Supervisors of Elections have filed, together with additional affidavits, a separate motion for summary judgment under Rule 56, raising questions similar to those presented herein by the Mayor and City Council. In view of the short period of time remaining until the primary election, this Court suggested, and counsel for the parties readily agreed, that the case should be heard at the same time both on its merits and on the pending motions. The defendants have accordingly filed answers, without prejudice to a full consideration of the legal questions raised by their motions, and to expedite the trial, counsel for the parties have agreed upon a number of stipulations. An all-day hearing was held on August 13, 1971, at which the various stipulations were presented to the Court, numerous exhibits were put in evidence, and one witness was called to testify. The case was fully and ably argued by counsel for all the parties both on the motions and on the merits.

### The History of Ordinance No. 1023.

Since Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), various redistricting plans for the Baltimore City Council have been attacked in this Court. In Ellis v. Mayor and City Council of Baltimore, 234 F.Supp. 945 (D.Md.1964), the apportionment existing in 1963 was challenged and found to be unconstitutional in an opinion by Judge Winter. The Fourth Circuit affirmed. 352 F.2d 123 (4th Cir. 1965). A later plan was upheld by Judge Thomsen in Ellis v. Mayor and City Council of Baltimore City, 267 F.Supp. 263 (D. Md.1967).

For a better understanding of the issues presented in this case, particular events leading up to the adoption of Ordinance No. 1023 will be set forth in some detail. In 1966, the Baltimore City Council redistricted the City into six councilmanic election districts in accordance with the existing provisions of the Baltimore City Charter dealing with reapportionment.[4] In 1967, the eighteen members of the Baltimore City Council were elected under the 1966 redistricting plan, with three members being elected from each councilmanic district to hold office for a period of four years.

3. A three-judge court is not required in this case because the attack here has been made against a City ordinance, not against a state statute. See 28 U.S.C. § 2281, and Chavis v. Whitcomb, 305 F. Supp. 1359 (D.Ind.1969).

4. This was the plan held to be constitutional by Judge Thomsen in Ellis v. Mayor & City Council of Baltimore City, *supra.*

On November 3, 1970, the voters of the City approved an amendment to § 7 of Article III of the Charter of Baltimore City (1964 Revision, as amended), which provides as follows:

"Section 7. Councilmanic Districts (A) The City shall be divided by ordinance into districts for the election of members of the City Council. The criteria in redistricting shall be equality of population, contiguous territory, compactness, natural boundaries, existing councilmanic district lines, and the standards established by the Supreme Court of the United States.

(B) Following each census of the United States, the Mayor shall prepare a plan for councilmanic redistricting. The Mayor shall present the plan to the City Council not later than the first day of February of the first municipal election year following the census. After the Mayor's plan is presented to the City Council, the council may adopt it or amend it or the City Council may adopt another plan. If no plan has been ordained by the City Council within sixty days after the Mayor's plan is presented, the Mayor's plan shall take effect as the redistricting ordinance."

Following approval of this amendment to the City Charter, the Mayor appointed an advisory committee on councilmanic redistricting composed of City Councilmen, community leaders and other citizens, with the request that such committee prepare a redistricting plan for the City for presentation by the Mayor to the City Council as required by said § 7(B). Dr. Harry Bard, President of the Community College of Baltimore, was appointed chairman of this committee, which was thereafter known as the "Bard Committee." [5]

The Bard Committee was immediately faced with a problem created by the statutory deadlines included in the redistricting legislation. Under § 7(B), the May-or was required to present the new redistricting plan to the City Council not later than February 1, 1971. This plan was to be based on 1970 census figures, but it became apparent that these figures would not be available for Baltimore City until shortly after February 1, 1971. In response to a request from the Mayor for advice concerning this dilemma, the City Solicitor, in a formal written opinion dated January 20, 1971, advised the Mayor that the February 1 deadline set forth in § 7(B) was mandatory. The City Solicitor pointed out that this date would allow for a minimum of three months to elapse from the date on which new district lines were set (namely, April 1) to the final date for the filing by candidates of certificates of candidacy (namely, July 6) and concluded that this three-month period was specifically intended by the framers of the amendment to provide adequate notice of new district lines to all those contemplating filing.

Acting pursuant to this advice, the Bard Committee submitted to the Mayor and the Mayor in turn presented to the City Council on February 1, 1971 a plan for councilmanic redistricting (the so-called "Original Bard Plan"). This plan was based on population estimates prepared by the City Planning Department using 1968 population projection data, and in his letter of transmittal, the Mayor pointed out that it might be necessary to amend this plan when 1970 census figures were available. Shortly thereafter on February 8, 1971, the United States Bureau of the Census released census data for the City of Baltimore based on the final results of the 1970 Census. In comparing the final census data with the City Planning Department estimates, the Bard Committee concluded that the differences were too great for the Original Bard Plan to meet legal requirements, and it undertook to amend such Plan. On February 19, 1971, the Bard Committee presented to the Mayor a revised plan (the so-called "Amended

5. Dr. Bard had considerable experience in redistricting during the 1960's, as indicated by the *Ellis* opinions, 234 F.Supp. at 947 and 267 F.Supp. at 264–266.

Bard Plan"), which the Committee concluded met constitutional requirements. On February 22, 1971, the Mayor forwarded the Amended Bard Plan to the City Council indicating that although he did not concur with this Plan's conclusions, he thought it appropriate that the City Council have the benefit of modifications of the Original Bard Plan prepared in accordance with the 1970 Census statistics.

In a letter to the President of the City Council dated March 1, 1971, the City Solicitor expressed the opinion that in submitting the Amended Bard Plan to the City Council, the Mayor had substantially complied with § 7(B) and that such Plan should be considered as relating back to the February 1 deadline. The City Solicitor pointed out that the City Council had only 30 days to act and reminded the City Council that if no plan was adopted by it by April 1, 1971, that Plan would automatically take effect on that date. The City Solicitor further requested that any substitute or amended plan introduced should be submitted to his office for approval as to form and legal sufficiency before final passage by the City Council.

Thereafter, the City Council considered and rejected the Amended Bard Plan. City Councilman Reuben Caplan (Fifth District) then prepared and introduced before the Council another plan (the so-called "Caplan Plan"). This plan was presented to the City Solicitor for a ruling as to its constitutionality. In a letter dated March 29, 1971 to Councilman Emerson R. Julian (Fourth District), the City Solicitor concluded that the Caplan Plan did not comply with the requirements of aforesaid § 7 of the Baltimore City Charter. In the course of his opinion, he said the following:

"An examination of the geographical boundaries of the Caplan Plan, when compared with the boundaries of the current plan and the amended Bard Plan, discloses that the Caplan Plan has significantly altered the configuration of the Fifth District. Under both the current and amended Bard Plans the Fifth District borders on the Fourth District on roughly two sides, but under the Caplan Plan the Fifth District comes close to encircling the Fourth District. Clearly, this plan has failed to utilize the criteria of compactness and existing councilmanic district lines as set forth in the City Charter."

In addition, the City Solicitor in his letter of March 29 noted that the Caplan Plan likewise raised questions of racial gerrymandering. In the last two paragraphs of his letter he said the following:

"Parenthetically, we call your attention to an examination of the ratio of black population to white population in the Fifth District. Based upon 1970 census figures, the Fifth District currently has 57% black and 43% white population. Under the amended Bard Plan, the Fifth District has a 54.4% black population and a 45.6% white population. The current plan and the amended Bard Plan both produce a black majority in the Fifth Councilmanic District. Under the Caplan Plan the Fifth District changes to 39.-2% black population and 60.8% white population, thus altering the racial composition to provide a white majority. It is to be noted that black precincts were moved from the Fifth District to the Fourth District where a black majority already exists, and that white precincts were shifted from the Fourth to the Fifth District, thereby creating the aforementioned white majority in the Fifth District. On its face, the Caplan Plan does open itself to attack on grounds of racial discrimination since its effect, if adopted, will be to alter the racial balance. This attack would be grounded on the theory that the Caplan Plan constitutes 'an invidious discrimination', or one 'which would operate to minimize or cancel out the voting strength of racial or political elements of the voting population'. See Fortson v. Dorsey, 379

U.S. 433, 13 L.Ed.2d 401, 85 Sup.Ct. 498 (1965); Burns v. Richardson, 384 U.S. 73, 16 L.Ed.2d 376, 86 Sup.Ct. 1286 (1966); Gomillion v. Lightfoot, 364 U.S. 339, 5 L.Ed.2d 110, 81 Sup. Ct. 125 (1960).

"We cannot here decide whether such an attack would succeed, but we are of the opinion that if the Caplan Plan is adopted by the City Council, a Court test will inevitably follow. Assuming that the Court will concur in the conclusions we have reached and either invalidate the Caplan Plan for violation of the City Charter or by concluding that it does, in fact, constitute invidious discrimination, it will then have to decide whether to adopt the amended Bard Plan or formulate another plan."

The next day, March 30, 1971, the City Council approved Ordinance No. 1674, a redistricting plan different from any of those previously considered.[6] On March 31, 1971, the City Solicitor advised the Mayor that Ordinance No. 1674 was unconstitutional because of a total deviation from the standard of 5.3%, which could not be justified in view of the fact that the Amended Bard Plan had been able to achieve a greater equality of population within the respective districts. With time running out before the April 1 deadline, a meeting was held the same day in the Mayor's Office with the President of the City Council, Dr. Bard, several councilmen and Dr. Carolyn Battle in attendance with others.[7] This group prepared and presented to the City Council a new plan (the "New Plan"), which was thereupon presented to the City Solicitor for an opinion as to its constitutionality. In a letter to the President of the City Council dated April 1, 1971, the City Solicitor noted that the New Plan showed a total range from equality of population of 2.8%, thereby coming closer to absolute equality than any other plan which had theretofore been considered by the City Council. In concluding that the New Plan was constitutional, the City Solicitor did not consider, as it had in connection with the Caplan Plan, whether it would be open to attack on grounds of racial discrimination. The New Plan was considered and approved by the City Council that same day, April 1, 1971, and was immediately signed into law by the Mayor as Ordinance No. 1023.[8] It is this Plan which is being attacked in the present suit by the plaintiffs.

On October 26, 1970, the President of the Bar Association of Baltimore City, had announced the appointment of a Committee on Equal Justice Under Law to act for the achievement of equal justice for all citizens of the City regardless of race or economic station. At the suggestion of the First Vice President of the Association (now the President), a Subcommittee of the Committee on Equal Justice Under the Law was formed for the express purpose of involving itself in the then impending reapportionment of the councilmanic districts of the City. It was specifically suggested that the Subcommittee contact Dr. Bard and give the Bard Committee whatever help it might wish. The Subcommittee held its first meeting on January 28, 1971, and members of the Subcommittee attended various meetings of the City Council during February and March, 1971, when redistricting matters were before the Council.

After enactment of the new redistricting Ordinance on April 1, 1971, the Chairman of the Bar Association Committee formally requested the City Solicitor to procure from the City Planning Commission and furnish to the

6. This particular plan which enjoyed a very short life was never given a particular name by the parties and is referred to herein as the March 30 Plan.

7. Dr. Battle was a member of the Bard Committee representing the Baltimore City League of Women Voters. She testified at some length at the hearing in this case.

8. This Plan passed the City Council by a vote of 17–0. At the time of the vote, there were 4 black City Councilmen, 3 of whom were present at the time of the final vote and voted in favor of the Ordinance.

Committee data reflecting the racial makeup of all precincts in Baltimore City so that the Committee might undertake to determine the constitutionality of the plan as passed. The Deputy City Solicitor approved this request, and on April 29, 1971, Mr. Larry Reich, the Director of the City Planning Commission, furnished the Subcommittee with copies of precinct population estimates by race. In transmitting this material to the Subcommittee, Mr. Reich requested that he be advised if the new district boundaries were to be challenged in court and what information might be required from his staff in connection therewith. The figures supplied by Mr. Reich were based on 1970 Census data.

On July 1, 1971, a Report on Redistricting of the Councilmanic Districts of the City, prepared by the Subcommittee, was considered and approved by the full Bar Association Committee of Equal Justice Under Law. According to this Report, evidence considered by the Subcommittee indicated that the new redistricting plan minimized the City's black voting strength, and the Report concluded that there was reason to believe that this minimization was racially motivated and that there was a serious question as to the New Plan's constitutionality. A news conference was held on July 3, 1971 attended by representatives of various local television stations and other news media. A press release prepared and issued by the Subcommittee resulted in wide publicity being given throughout the City on July 3, 1971 to the Committee Report. The press release stated, *inter alia*, that "the Committee on Equal Justice Under Law of the Bar Association of Baltimore City should honor any request it may receive to provide lawyers, *pro bono publico*, to test the plan's constitutionality or, if no such request

is made and litigation is otherwise instituted, the Committee should seek to participate in that litigation as *amicus curiae*." Following this publicity, there was communication between a member of the Subcommittee and potential litigants, pleadings were prepared, and suit was filed in this Court on July 16, 1971.[9] The attorneys appointed by the Bar Association to represent the plaintiffs were not members of the Bar Association Committee or of the Subcommittee.

*The Law*

■ Racial gerrymandering, like other forms of racial discrimination, violates the Fourteenth Amendment. Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). What is not clear from the few reported cases since *Gomillion* is what type of legislative action is included within the term "racial gerrymandering." Without question, any redistricting that deprives a member of a minority race of his right to vote is constitutionally impermissible. Thus in *Gomillion*, a state statute, which changed the boundaries of the City of Tuskegee, Alabama, from a square into a "strangely irregular" twenty-eight-sided figure and which thereby left only four or five Negro voters in the City as compared to four hundred previously, was held to be unconstitutional. In Sims v. Baggett, 247 F.Supp. 96 (N.D. Ala.1965), an Alabama redistricting statute, which combined three counties into a single district for the sole purpose of preventing the election of a Negro member of the House of Representatives, was likewise held to be invalid.

But the present case is not concerned with the right of the black plaintiffs to vote in the forthcoming councilmanic

9. Any question concerning the propriety of the Subcommittee's action in extending through the press an implied invitation to prospective litigants to come forward and file suit is not at issue in this case. This Court will therefore express no opinion on this question, particularly since

it is not clear from the record here whether members of the Subcommittee arranged for a plaintiff from every Councilmanic District to be a party hereto or whether plaintiffs came forward on their own and requested representation by attorneys to be appointed by the Bar Association.

elections or with their being prevented from electing one or more black members of the City Council. Under the plan being attacked here, the plaintiffs and other black voters located in the six councilmanic districts in Baltimore clearly have the right to vote for candidates of their choice to represent them in the Baltimore City Council, and in at least two districts have the power through bloc voting to elect black councilmen. The claim here is that plaintiffs' right to vote has been unconstitutionally diluted by action taken by the Baltimore City Council on April 1, 1971. The injury alleged in this case is therefore similar to the one claimed by the plaintiffs in Wright v. Rockefeller, 211 F. Supp. 460 (S.D.N.Y.1962), affirmed 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), a case in which the District Court denied relief on the facts presented to it. In claiming here that any dilution of minority voting strength is actionable which affects the right of a member of the minority race to exercise his franchise, plaintiffs in effect espouse the same position taken by Justices Douglas and Goldberg who dissented in Wright v. Rockefeller, 376 U.S. at 59–74, 84 S.Ct. 603. The majority of the Supreme Court, however, decline to go along with this construction of the term "racial gerrymandering." According to Mr. Justice Black writing for the majority in *Wright*, the test is whether "the challenged [redistricting] was the product of state contrivance to segregate on the basis of race or place of origin." *Id.*, at 58, 84 S.Ct. at 606. Applying this test, the Supreme Court in *Wright* affirmed the findings reached by the majority of the three-judge district court below that the New York State Legislature was neither motivated by racial considerations nor in fact drew the congressional districts in question on racial lines. *Id.*, at 56, 84 S.Ct. 603.

Subsequently, in a dictum in Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965), the Supreme Court suggested that designedly or otherwise, a multi-member constit-uency apportionment scheme might well under the circumstances of a particular case operate "to minimize or cancel out the voting strength of racial or political elements of the voting population." This observation was quoted with approval recently in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), which held that multi-member districts are not inherently invidious and violative of the Fourteenth Amendment.

In the 1967 *Ellis* case, *supra*, a claim was made similar to the one here, namely that the 1966 City redistricting plan diluted the voting strength of black voters. Judge Thomsen, relying on *Wright*, found that it had not been proved that the voters who adopted the 1966 plan were motivated by racial considerations, or that the districts were drawn on racial lines. He concluded that "No 'racial gerrymandering' or any other violation of the constitutional rights of cross-claimant or any other person has been proved." (267 F.Supp. at 267).

### The Facts

Applying the principles of these decisions to the facts of the present case poses problems of considerable complexity. Unlike *Gomillion*, there is no actual disenfranchisement here of a large number of black voters. Nor, as in *Sims v. Baggett*, is there any clear purpose of preventing the election of any black member of the legislative body in question.

According to 1970 Census figures, the City of Baltimore has a population of 905,759 persons. Of these 53% are white, 46.4% are black and .6% represent other races. Plaintiffs contend that the plan adopted by the City Council dilutes their right to elect representatives of their choice to the City Council. When the percentages are considered from one point of view, it is questionable whether there has been any dilution of the plaintiffs' right to vote at all. If there were a perfect racial division in each district, plaintiffs would be in the minority in all six and might

be less able to elect black Councilmen than at present.

On the other hand, if the figures are studied in another light, the plaintiffs' right to vote has indeed been diluted, but the amount thereof cannot be readily measured. If it be assumed that citizens in the City of Baltimore would vote strictly in accordance with their race, white voters would be entitled to 9.54 members of the City Council, black voters to 8.35 members and voters of other races to .11 members.[10] Planning Commission figures supplied on April 29, 1971 to the Bar Association Committee show that the racial composition of the various districts under the Old Plan, the Amended Bard Plan and the New Plan is as follows (Exhibit E to Affidavit of Kenneth L. Johnson):

|  | Old Plan (before 4/1/71) | Amended Bard Plan (introduced 2/19/71) | New Plan (adopted 4/1/71) |
|---|---|---|---|
| **DISTRICT 1** | | | |
| Black | 16.0% | 14.7% | 19.2% |
| Non-Black | 84.0% | 85.3% | 80.8% |
| **DISTRICT 2** | | | |
| Black | 68.4% | 65.5% | 65.8% |
| Non-Black | 31.6% | 34.5% | 34.2% |
| **DISTRICT 3** | | | |
| Black | 11.6% | 12.8% | 12.0% |
| Non-Black | 88.4% | 87.2% | 88.0% |
| **DISTRICT 4** | | | |
| Black | 85.2% | 85.6% | 95.5% |
| Non-Black | 14.8% | 14.4% | 4.5% |
| **DISTRICT 5** | | | |
| Black | 58.0% | 55.6% | 49.3% |
| Non-Black | 42.0% | 44.4% | 50.7% |
| **DISTRICT 6** | | | |
| Black | 41.0% | 43.4% | 36.6% |
| Non-Black | 59.0% | 56.6% | 63.4% |

Plaintiffs assert that the Amended Bard Plan is constitutional but attack the New Plan as an unconstitutional dilution of their voting power. Assuming voting along racial lines, the Amended Bard Plan would quite clearly appear to be more favorable to plaintiffs, permitting black voters (with majorities in three of the six districts) to theoretically elect 9 of 18 City Councilmen and white voters to elect the other 9. Under a similar assumption, the New Plan, on the other hand, would theoretically permit the election of 6 black Council-

10. The Court makes this assumption solely for the purpose of analyzing the statistics in evidence. Election results over the years quite obviously show such assumption to be unwarranted as a practical matter. What is involved here is the theoretical right of black voters in the City to vote for black candidates if they choose to do so.

men and 9 white Councilmen, with 1 district being almost equally divided (49.3% black to 50.7% non-black).

In *Ellis*, the figures for the plan under attack show the following (267 F. Supp. at 266):[11]

|  | White | Non-White |
|---|---|---|
| DISTRICT 1 | 88.5% | 11.5% |
| DISTRICT 2 | 45.7% | 54.3% |
| DISTRICT 3 | 92.8% | 7.2% |
| DISTRICT 4 | 20.5% | 79.5% |
| DISTRICT 5 | 63 % | 37 % |
| DISTRICT 6 | 59.5% | 40.5% |

In finding no constitutional infirmity as a result of these figures, Judge Thomsen said this (267 F.Supp. at 266):

"In view of the population ratio (59–41) and the ratio of registered voters (65–35), any other result than a white majority in four districts and a non-white majority in two would have been subject to serious question."

Measured against a theoretical optimum, the Amended Bard Plan gives plaintiffs more than the fair representation to which they would be entitled as a minority race in the City of Baltimore. (50% of the Council as opposed to 46.4% of the population). On the other hand, the New Plan would appear to give plaintiffs less than the theoretical maximum based on total population figures, depending upon the almost even racial division in the Fifth District.

The difficult question before the Court on the present record is whether the figures set forth hereinabove amount to such a dilution of the votes of black citizens of the City that their Fourteenth and Fifteenth Amendment rights have been infringed. Any such dilution should be measured not against the Amended Bard Plan, as claimed by plaintiffs, but against a theoretical optimum designed to give fair representation to both minority and majority groups in the City. The question becomes all the more complex because of the many diverse factors other than racial considerations that must be considered in drawing a plan of redistricting. Besides being concerned with racial considerations and with the primary factor of equality of population, the Baltimore City Council, pursuant to the mandate of § 7(A) of Article III of the Charter, must take into account contiguous territory, compactness, natural boundaries and existing councilmanic district lines in reaching their ultimate conclusion.

However, in this particular case it is not necessary to decide this complex question on the abbreviated record before the Court. Because of the disruption that would occur to the elective process and the prejudice that would be suffered by present candidates and others if the pending elections were enjoined, this Court has concluded, as more fully discussed below, that it should withhold relief at this time regardless of the merits of the plaintiffs' claim.

*The Necessity for Withholding Relief*

In Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court recognized that even though an apportionment scheme might be found to be invalid,

11. In that case, registration figures rather than population figures were used.

a federal court might be justified in withholding relief. At page 585, 84 S. Ct. at page 1394, the Court said this:

"* * * [U]nder certain circumstances, *such as where an impending election is imminent and a State's election machinery is already in progress,* equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, *a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.* With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." (Emphasis added).

Judge Thomsen applied the principles of the *Reynolds* case as one of the grounds for dismissing the complaint in Pohoryles v. Mandel, 312 F.Supp. 334 (D.Md.1970). The plaintiffs in that case challenged the constitutionality of the apportionment of the Maryland General Assembly. The suit was filed on April 6, 1970, with July 6, 1970, being the final date for candidates to file for the September primary and November general elections.[12] In concluding that the action was barred by laches, Judge Thomsen noted that there was no reason why the complaint could not have been filed the previous year and said the following (at page 341):

"But if plaintiffs had filed their suit last year, and if the Court had found that reapportionment before the 1970 elections is required, the Court could have so ruled before the 1970 session of the Legislature, and could have given the Governor and the Legislature an opportunity to develop a plan deliberately. Plaintiffs say that 'no prejudice is shown by the date of filing'. But the prejudice to persons who wish to run for the Senate or the House is evident. They must know the boundaries of the district in which they live. Some have already filed, and others are completing their plans."

In affirming Judge Thomsen's dismissal of this action, the Fourth Circuit said the following in Maryland Citizens for a Representative General Assembly v. Governor of Maryland, 429 F.2d 606, at page 610 (1970):

"Whether the development of a new reapportionment plan was undertaken by the General Assembly or the court, its emergence in final form could not have been expected until close upon the eve of the July 6, 1970 deadline for the filing of candidacies. Such a result would necessarily impose great disruption upon potential candidates, the electorate and the elective process. While such a consequence might be tolerable in certain situations where the state adamantly has refused to comply with clear constitutional mandates and court orders, e. g., Swann v. Adams, 383 U.S. 210, 87 S.Ct. 569, there has been no such recalcitrance in Maryland. Her demonstrated purpose to achieve a constitutional apportionment and, after 1970, to adopt reapportionments decennially, makes her deserving of immunity from such harsh decrees."

The Fourth Circuit went on to review the Supreme Court's action in Chavis v. Whitcomb, 305 F.Supp. 1364 (D.Ind. 1969), in which the Supreme Court permitted an election to be held in Indiana even though the District Court had found the Indiana apportionment statute to be unconstitutional. 396 U.S.

12. With the full cooperation of counsel in that case, a scheduling conference was

held on April 13, 1970 and argument was heard on April 24, 1970.

1055, 90 S.Ct. 748, 24 L.Ed.2d 757 (1970) and 396 U.S. 1064, 90 S.Ct. 761, 25 L.Ed. 2d 82 (1970). The Court then said this (at pages 610–611 of 429 F.2d):

"We believe that the same considerations which are present in *Chavis* are present in this case, and that here, as in *Chavis*, the federal courts should withhold relief regardless of the merits of the plaintiffs' claim. In *Chavis*, as here, the validity of the plaintiffs' claim for relief turns on legal questions, the answers to which are not clearly or determinatively established. In *Chavis*, as here, reapportionment prior to the 1970 elections would be particularly disruptive of legislative stability and continuity. In *Chavis*, a reapportionment plan was not approved until three months prior to the filing deadline for the 1970 elections. Here a reapportionment plan could not possibly have been approved earlier than a few weeks before the filing deadline. In *Chavis*, where, unlike here, the suit was brought long before the election, the state refused to undertake reapportionment even though there had been a judicial determination that the existing apportionment was invalid and the court had given the state an opportunity to act. Here, as we pointed out above, the state has in no way been recalcitrant in not reapportioning. We can only conclude that if relief was appropriately withheld in *Chavis, a fortiori*, it must be withheld in this case".

■ The facts of the present case show prejudice to potential candidates and the disruption of the elective process much more clearly than did the facts in the *Maryland Citizens* case.[13] Here, the redistricting plan under challenge became law on April 1, 1971. However, suit was not filed until July 16, 1971, more than three and one-half months later. This date was some ten days *after* the last day for candidates for the City Council to file certificates of candidacy for the September primary and was only two months before the primary itself.[14]

Before this case came on for hearing, the date for final withdrawal of a candidate, namely, July 31, 1971, had likewise passed. Some 110 candidates have filed for the primary election and have been campaigning vigorously since early July. Plaintiffs do not seek to enjoin the city-wide elections for Mayor, Comptroller and President of the City Council, which are scheduled for the same dates as the councilmanic elections. If an injunction were to be issued by this Court postponing the councilmanic elections, dual elections would have to be held. Undoubtedly, the Board of Supervisors of Elections of Baltimore City would not be able to hold any such special councilmanic primary and general elections until well after the November city-wide general election. Double costs and a double burden would be assumed by election officials. More importantly, present candidates for City Council would lose in large measure the benefit of the extensive campaigning undertaken to date, all of which would have to be repeated before a later election. It would not be possible for those candidates who had formed political alliances with candidates for Mayor to run on a combined ticket in any later special election. Nor, would it be expected that as many voters would turn out at a later election involving only City Councilmen, with fortuitous results that cannot be foreseen at the present time.

As required by State law, the form and arrangement of the ballots for the primary election have already been prepared by election officials and have al-

13. Article 33, Annotated Code of Maryland (1967 Repl. Vol.) establishes the deadlines for all elections in Maryland including those involved here.

14. Under the Baltimore City Charter, a candidate need not reside in the district in which he seeks election. However, it would of course be important for a candidate to know the boundaries of the district from which he would be running so as to be able to assess his political strength in that district before filing.

ready been made available for inspection by all candidates. Absentee ballots have been printed, many have been mailed out and one such ballot has even been returned. Various other steps have already been taken by the Board of Supervisors of Elections in connection with the impending primary election, including the printing of primary ballot strips and preparations for the loading and delivery of over 1300 voting machines. To postpone these elections at this eleventh hour would unduly disrupt the elective process and would seriously prejudice citizens, candidates and government officials alike. Particularly since, as in *Maryland Citizens*, the validity of the plaintiffs' claim for relief here turns on legal questions the answers to which are not clear, this Court will withhold the granting of equitable relief in this case.

Plaintiffs contend that they acted reasonably promptly in filing suit in this case because they had no knowledge of the possible unconstitutionality of the New Plan until the Bar Association Committee's Report was made public on July 3, 1971. But this is no excuse. The specter of racial gerrymandering had been raised by the City Solicitor himself in discussing the Caplan Plan in his opinion of March 29, 1971, and according to the complaint, there was "a widespread public outcry against the Caplan Plan." Plaintiffs have argued in this Court that the New Plan amounted to little more than the racially-suspect Caplan Plan with slight modifications and that this fact is apparent from a mere inspection of the maps themselves. If this is so, such a fact was as obvious in April as it was in July when suit was finally filed. Maps were available for public inspection, as were the details of the Amended Bard Plan and its progeny, and there was widespread discussion in the press of all the plans before the City Council.[15] § 7(B) itself discloses that redistricting following a decennial census must adhere to stringent deadlines,

and this provision was clearly intended to permit candidates to have sufficient time after the adoption of a plan to decide whether or not to file for municipal office.

Even if it were to be assumed that plaintiffs were not to be charged with knowledge of these public facts and were justified in waiting for the issuance of the Bar Association Report, this document was unduly and unjustifiably delayed. A Subcommittee of the Bar Association's Committee on Equal Justice Under the Law had been in existence since January, 1971, and had stayed in close touch with the City Council's redistricting efforts. Opinions of the City Solicitor were readily available to this Subcommittee, including that of January 20, 1971, which specifically referred to the *Maryland Citizens* case and the prejudice that might result to prospective councilmanic candidates if a plan were not adopted by April 1, 1971. Indeed, one of the affidavits filed by the plaintiffs discloses that the Subcommittee at a meeting in May decided to defer issuance of its report until after the Supreme Court had handed down a decision in Whitcomb v. Chavis, *supra,* which was decided on June 7, 1971. However prudent it might have been to await the latest pronouncements by the Supreme Court on the subject of redistricting, such can hardly justify the failure of the Bar Association Committee and of the plaintiffs to decide in April or May whether they wished to bring this matter into court, in view of the prejudice that delay would cause to candidates, electoral officials and the voting public.

As justification for the delay here, plaintiffs further claim that it was necessary before filing suit to secure and analyze pertinent precinct racial data which was not made available to the Bar Association Committee until April 29, 1971. But plaintiffs have also argued that City Councilmen on April 1, 1971, purposely altered district lines to mini-

---

15. In sequence, the City Council considered the Amended Bard Plan, the Caplan Plan, the March 30 plan and finally the New Plan.

mize black voting strength. Certainly, if seventeen City Councilmen were able to know on April 1, 1971 the racial composition of key precincts so as to manipulate them to plaintiffs' disadvantage, then plaintiffs themselves presumably could have ascertained these same facts soon after the redistricting plan was approved.

■ Not only was there undue delay in the filing of this action, but also plaintiffs' counsel unnecessarily delayed prosecution of the suit. Appropriate steps were not taken to have the case promptly heard and decided and an appeal taken within the shortest possible time. On July 15, 1971, counsel for the plaintiffs met with representatives of the City Solicitor's Office and with Chief Judge Northrop and informed them that the next day suit would be filed attacking Ordinance No. 1023. At that time, Judge Northrop advised counsel that a judge would be available on July 28, 1971 to hear any motions that might be filed in the case and, further, that the Fourth Circuit Court of Appeals would be sitting in Baltimore during the week of August 23, 1971 and presumably would be available to hear an immediate appeal. The complaint was filed on July 16, the day after such meeting, and chief counsel for the plaintiffs promptly left for a 3-week vacation. During his absence, little was done to advance the case. Service of process was not effected on any of the defendants until July 22.[16] No request was made for a scheduling conference by the attorney who had been left in charge of the litigation until August 4, 1971. When such request was finally made, a conference was promptly held with the Court on the afternoon of August 4, at which this attorney informed the Court that he would be leaving on his vacation before chief counsel for the plaintiffs returned. Having filed the action as late as they did, counsel for plaintiffs had at the very least the duty to prosecute the action as promptly as possible, including making arrangements for immediate service of process [17] and meeting with the Court as soon as service was made to set a schedule for the filing of pleadings and a hearing date. With candidates, election officials and the general public waiting anxiously to learn if this Court would enjoin the September 14 election, unnecessary weeks were lost which added to the prejudice previously outlined.

■ Plaintiffs have requested that if the Court concludes that it should not because of equitable considerations enjoin the primary and general elections scheduled for September and November, 1971, the Court should in any event retain jurisdiction and require the Mayor and City Council to adopt a constitutional redistricting plan for subsequent elections. However, if the scheduled elections are held and a new Mayor and City Council are elected on November 2, 1971, presumably the defendants named in this suit (or in any event, many of them) will no longer be empowered to act in redistricting matters. If plaintiffs wish to press the questions raised herein on the merits, they should file a new action after the pending elections have been held.[18] This Court's dismissal of the pending suit will therefore be without prejudice to the filing of a later action against the proper parties raising the same questions.

---

16. Process has still not been served on the President and seventeen other members of the City Council.

17. There is no reason why plaintiffs' counsel could not have applied to the Court under Rule 4(c) for the special appointment of some one to make immediate service on defendants.

18. On August 12, 1971, the day before the hearing in this case, plaintiffs filed a pleading entitled "Amended Complaint." This pleading, which sought to add an additional issue in the case, was stricken on motion of defendants because it did not comply with Rule 15 and had not been timely filed. In any new action, plaintiffs would of course be entitled to present this additional claim to the Court.

For the reasons stated, the defendants' motions for summary judgment are granted, without prejudice. A formal order to such effect will be entered by the Court.